UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEITH SHORT and FAIR HOUSING JUSTICE
CENTER, INC.,                                       :

               Plaintiffs,                    :

    - against -                                   :

MANHATTAN APARTMENTS, INC., ABBA          :
REALTY ASSOCIATES, INC., SONI REALTY LLC,
KIMBERLY PLACE REALTY CORP., and           :
SAEED M. ASKARINAM d/b/a ASKARINAM
REALTY,                                             :

               Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

11 civ 5989

Civ. _____ (ECF)

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs Keith Short and Fair Housing Justice Center, Inc. ("FHJC"), by their

attorneys, Emery, Celli, Brinckerhoff & Abady and Housing Works, Inc., allege as follows:

## PRELIMINARY STATEMENT

    1.     Plaintiff Keith Short is a 45 year-old, indigent, disabled man living with AIDS

and a host of attendant maladies. After moving to New York from Washington, D.C. in

September 2010, Mr. Short became a client of the HIV/AIDS Services Administration

("HASA"), which provided Mr. Short with emergency housing in a single room occupancy hotel

(an "SRO"). Approved for a HASA housing subsidy, Mr. Short began searching for an

apartment within the price range allowed by HASA.

    2.     Mr. Short's search for a home in New York City led him to Defendants, real

estate companies and a landlord that blatantly refused to rent, refused to negotiate for the rental

of, or otherwise denied an apartment to Mr. Short because he is disabled and because of his

source of income. In so doing, Defendants violated the Fair Housing Act and the New York City

1

Human Rights Law.

3.      As a result of this discrimination, Mr. Short remained homeless for many months, unable to secure permanent housing, a critical element in the health and well-being of a person living with AIDS.

4.      In response to Mr. Short's request for help, FHJC conducted fair housing tests to determine whether Defendants would rent apartments, within the price range allowed by HASA, to unemployed, disabled individuals with a HASA housing subsidy.  FHJC testers confirmed that Defendants would not show or negotiate to rent an apartment once Defendants' agent/s learned that renters seeking an apartment had a disability, were not working because of a disability, and/or had a housing subsidy from HASA.  In sharp contrast, testers who told Defendants' agent/s that they were employed were shown apartments and given information about apartments for rent within a similar price range.

5.      This action seeks (a) to compensate Mr. Short for damages he suffered as a result of Defendants' discrimination, including emotional damages and the loss of housing opportunities that perpetuated his homelessness; (b) to compensate FHJC for its diversion of resources and frustration of mission; (c) punitive damages, because Defendants' conduct was willful, intentional, and in reckless disregard of the Plaintiffs' civil rights; (d) an order that Defendants, among other things, develop and implement non-discrimination policies in accordance with federal and city civil/human rights laws, and train all employees and agents on those laws; (e) reasonable attorneys' fees and costs; and (f) such other and further relief as this Court deems just and proper.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42

U.S.C. § 3613.  This court has supplemental jurisdiction over the New York City law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1) because at least one of the Defendants is located within this District and all the Defendants are located in the State of New York.  In addition, venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

<u>**PARTIES**</u>

8.      Plaintiff Keith Short is a 45 year-old disabled man living with AIDS.  He resides in Bronx, New York.  Since September 2010, Mr. Short has been a client of HASA and currently uses a HASA housing subsidy to rent his apartment.

9.      Plaintiff Fair Housing Justice Center, Inc. is a non-profit, New York City-based organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.  FHJC expended significant staff time and other resources to investigate and respond to Defendants' discriminatory rental practices, which diverted resources away from other FHJC activities.  Furthermore, Defendants' discriminatory rental practices frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in the New York City region by, among other things, making apartments unavailable because of disability and source of income.

10.      Plaintiffs' right to relief is asserted with respect to or arising out of the same series of transactions or occurrences and there are common questions of law and fact as to all Defendants that will arise in the action.

11.      Defendant Manhattan Apartments, Inc. ("Manhattan Apartments") is a New York

corporation located in Manhattan, New York.  At all relevant times, Defendant Manhattan Apartments was in the real estate business, and, among other things, was brokering the rental of apartments in New York City.

12.     Defendant Abba Realty Associates, Inc. ("Abba") is a New York corporation located in Brooklyn, New York.  Upon information and belief, Abba does business in Manhattan and the Bronx.  At all relevant times, Defendant Abba was in the real estate business, and, among other things, was brokering the rental of apartments in New York City.

13.     Defendant Soni Realty LLC ("Soni") is a New York corporation located in Manhattan, New York.  At all relevant times, Defendant Soni was in the real estate business, and, among other things, was brokering the rental of apartments in New York City.

14.     Defendant Saeed M. Askarinam d/b/a Askarinam Realty ("Askarinam") is licensed by the State of New York as a real estate broker with an office located in Brooklyn, New York.  At all relevant times, Defendant Askarinam was in the real estate business, and, among other things, was brokering the rental of apartments in New York City.

15.     Defendant Kimberly Place Realty Corp. ("Kimberly Place") is a New York corporation located in Manhattan, New York.  Upon information and belief, Defendant Kimberly Place was the owner of a rental building located at 5056 Broadway in Manhattan, New York and utilized the real estate brokering services of Defendant Soni at all relevant times.

## BACKGROUND

### The Nature of AIDS and the Creation of HASA

16.     HIV is a virus that attacks the immune system and leaves the body unable to ward off infection and disease.  As a result:

> People living with HIV and AIDS develop numerous illnesses and
> physical conditions not found in the general population, and experience

4

manifestations of common illnesses that are much more aggressive, recurrent, and difficult to treat. Infections and cancers spread rapidly in a person whose immune system has been compromised, and the effectiveness of medicine is diminished by nutritional problems that limit the body's ability to absorb what is ingested. Illnesses that are not lethal to the general population can kill an HIV-infected person.

Henrietta D. v. Giuliani, 119 F. Supp. 2d 181, 185 (E.D.N.Y. 2000), aff'd, 331 F.3d 261 (2d Cir. 2003), cert. denied, 541 U.S. 936 (2004).

17.     Individuals living with HIV progress from an asymptomatic stage to the development of symptoms such as weight loss, severe gynecological infections, chronic diarrhea, and fatigue. Henrietta D., 191 F. Supp.2d at 185. "Eventually, HIV and AIDS strip the body of all defenses, leaving the infected person unable to fend off or combat new and existing infection and illness. At this later stage of HIV infection, patients commonly develop 'opportunistic infections' such as PCP pneumonia, cryptococcal meningitis, and Kaposi's Sarcoma, diseases particular to persons with compromised immune systems. These illnesses and infections eventually cause death." Id. at 185.

18.     Medication, including HIV medication, is essential to the health, wellbeing, and survival of a person living with clinical/symptomatic HIV illness or AIDS. Without adequate and stable housing, people living with AIDS ("PLWAs") find it extremely difficult to maintain their medication regimen, or even to properly store and refrigerate their medication and the fresh, nutritional food that they desperately require. Id. at 186.

19.     Indeed, there is an expression in the AIDS community: "Housing is healthcare." As a 2005 study commissioned by the New York City Mayor's Office on AIDS Policy Coordination concluded: "Homeless persons with HIV/AIDS face unusual health risks. They are thought to experience higher rates of morbidity and mortality than domiciled persons with

HIV/AIDS, to face greater barriers to health care, and to be less likely to have access to and/or the supports necessary to comply with complex anti-HIV drug regimens. In New York City, homelessness or unstable housing has been found to be persistently associated with barriers to medical care, lower rates of service utilization, and poor adherence to complex treatment regimens." (Hudson Planning Group, "An Assessment of the Housing Needs of Persons with HIV/AIDS, New York City Eligible Metropolitan Statistical Area," (New York 2005), at 42-43.)

20.     For PLWAs, homelessness and unstable housing are huge barriers to avoiding illness and infection, altering high risk behaviors, and accessing mental health and other services that many PLWAs desperately require. As Mayor Bloomberg's 2005 Consolidated Plan explains: "The high prevalence of HIV/AIDS in the New York City EMSA (Eligible Metropolitan Services Area) among people who are homeless or unstably housed significantly increases the cost and complexity of NYC's HIV/AIDS care system. Without safe, appropriate shelter, persons with AIDS are unable to adhere to complex antiretroviral drug regimens and also are exposed to conditions that threaten their health and well being." ("2005 New York City Consolidated Plan," at I-75.)

21.     HASA was created in 1985 as a subdivision of New York City's Human Resources Administration in recognition of the fact that PLWAs have special needs in accessing and maintaining their social welfare benefits. To qualify for HASA, a client must be indigent and living not merely with HIV, but with clinical/symptomatic HIV illness, or AIDS. All HASA clients are thus living with a disability, a fact that is commonly known by landlords and agents with affordable rental apartments in New York City; indeed, the agency is named the "HIV/AIDS Services Administration."

22.     For clients who are homeless, HASA provides temporary, emergency housing in

SROs. HASA clients housed in SROs typically search for a private apartment within New York City. Once an apartment is located, and upon approval, HASA provides clients with a monthly shelter allowance, typically a direct-vendor check to the landlord each month to pay the clients' rent.

## FACTUAL ALLEGATIONS

### Housing Search by Mr. Short

23.     Keith Short is an indigent, 45-year old man living with AIDS and a host of attendant maladies. In September 2010, Mr. Short became a client of HASA. Because Mr. Short was homeless, HASA provided Mr. Short with emergency housing in an SRO in Manhattan. Mr. Short then began to search for permanent housing – an apartment of his own – with the knowledge that if he found an apartment within a certain price range, HASA would provide him with a housing subsidy, i.e., HASA would pay his rent on an ongoing basis. HASA would also provide a security deposit, a broker's fee (if necessary), and the first month's rent.

### Fair Housing Justice Center

24.     Among other things, FHJC (a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; (b) provides intake counseling to individuals and organizations with allegations of housing discrimination; (c) conducts testing and other investigations of allegations of housing discrimination; (d) makes legal referrals to cooperating attorneys; (e) assists with the preparation and filing of administrative housing discrimination complaints; and (f) provides post-referral litigation support services. FHJC provides these services free of charge and without regard to income.

25.     FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing

enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

26.    FHJC employs individuals as "testers," persons who pose as renters or homebuyers for the purpose of obtaining information about the conduct of landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.

27.    Based on its particularized experience and knowledge, FHJC knows that in New York City it is common for real estate agents and landlords to refuse to rent to low-income people with disabilities even if they have sufficient resources to pay the rent from public sources of income.  FHJC knows that such discrimination is also common against low-income individuals whose source of income is a government program, such as HASA.  This intentional discrimination against persons with disabilities and/or a public source of income makes it extremely difficult for disabled and renters to find affordable housing.

**Manhattan Apartments' Blatant Discrimination Against Mr. Short**

28.    On January 4, 2011, Mr. Short found a suitable apartment listing on Craigslist and called Robert Salsberry, an agent of Manhattan Apartments, to inquire about the listing.  Mr. Salsberry told Mr. Short to come in to his office, stating that there were plenty of apartments in Manhattan in Mr. Short's price range.  During this phone call, Mr. Short did not tell Mr. Salsberry that he had a disability or received any public sources of income.

29.    On January 5, 2011, Mr. Short visited Mr. Salsberry at Manhattan Apartments, 729 Seventh Avenue in Manhattan.  When Mr. Short informed Mr. Salsberry that he was a HASA client, Mr. Salsberry told Mr. Short that "the landlords do not want any program people, only working people."  When Mr. Short asked Mr. Salsberry which landlords in particular felt

this way, Mr. Salsberry responded, "all of them, 100%," whereupon Mr. Short left Manhattan Apartments' office.

**FHJC Testing Investigation of Manhattan Apartments**

30.     On January 24, 2011, a female tester employed by FHJC telephoned Manhattan Apartments and spoke with Mr. Salsberry.  The tester, who told Mr. Salsberry she was employed, inquired about a one-bedroom apartment for rent up to $1,100 a month.  Mr. Salsberry informed her:  "I have apartments I can show you."  "I have a lot of apartments . . . quite a few I can show you."

31.     Later that same day, January 24, 2011, the same tester called Mr. Salsberry to say that she found an apartment, but was now looking on behalf of her son, a man with a disability who received a subsidy from HASA.  Mr. Salsberry informed her:  "At the time right now I don't have any, um, I don't have any um landlords that accept the vouchers right now." . . . "We [deal] with most of the major landlords and they don't really accept those.  Most of the smaller ones do."

32.     On April 1, 2011, a second female tester employed by FHJC visited the same office of Manhattan Apartments as Mr. Short had visited in January.  The tester met with Manhattan Apartments' agent Juanita Garcia-Meadows and explained that she was looking for a one-bedroom apartment on behalf of her son in the Inwood/Washington Heights area in the price range of $1,100 to $1,150 a month.  The tester told Ms. Garcia-Meadows that her son was receiving Social Security Disability and was a HASA client.  Ms. Garcia-Meadows informed the tester:  "The only thing with HASA is that I have to find a landlord who's gonna take that."  Ms. Garcia-Meadows continued:  "That's the only thing.  It's a government voucher and it's kind of like they have their own way of paying for an apartment so I have to find a landlord that takes

the program.  So let me find out."

33.    Ms. Garcia-Meadows then went on her computer and began typing/searching,

informing the tester:  "So far, the landlords that we have here are not, um, affiliated with the

HASA program." . . . "None that I have right now."  "There's some," she stated, "that are, um .

. . . They do take Section 8, so I'm gonna find out if they do take that HASA, because it's almost

the same thing."  She then announced, however, "Unfortunately, right now, we don't have [any

landlords who rent to HASA clients]."  When the tester inquired whether Ms. Garcia-Meadows

meant in the area in question or in general, Ms. Garcia-Meadows responded, "In general."

34.    Ms. Garcia-Meadows informed the tester:  "If something comes up, I'll get back

to you, yeah.  Because I have to find out who accepts the program.  Which landlords accept the

program."  Although Ms. Garcia-Meadows informed the tester that she would get back to the

tester, no one from Manhattan Apartments, including Ms. Garcia-Meadows, ever called the tester

back even though the tester left a phone number.

35.    On April 1, 2011, the very same day, a male, non-disabled tester employed by the

FHJC also visited Manhattan Apartments seeking a one-bedroom apartment under $1,200 a

month in Manhattan.  He met with Manhattan Apartments' agent Angela Fernandes and told her

he was employed, earning $41,000 a year.  Ms. Fernandes showed the tester listings and

photographs of typical one-bedroom apartments in Manhattan that were available in the price

range, under $1,200, and offered to show the tester the apartments.

36.    Four days later, on April 5, 2011, Ms. Fernandes telephoned the male non-

disabled tester and left a message on his voice mail suggesting that he come in on dates on which

she was available to view apartments.  On April 8, 2011, Ms. Fernandes again called the non-

disabled tester and left a voice mail message asking him to call her since he seemed interested in

the apartments.

**Abba's Blatant Discrimination Against Mr. Short**

37.     In October 2010, Mr. Short visited Abba on Albany Avenue in Brooklyn, New York in search of an apartment.  An individual at Abba asked Mr. Short, "Are you on a program?"  Mr. Short was then directed to Mercedes, an agent at Abba who, he learned, deals exclusively with clients who receive government housing subsidies.

38.     In early November 2010, on another visit to the Abba offices, Mr. Short noticed in the office window multiple listings for apartments that were both attractive to Mr. Short and within his price range.  When Mr. Short asked Mercedes about the apartments, she informed him that those apartments were not available for "programs."  Mr. Short pointed out that he was already approved by HASA for apartments in the price range of the apartments in question. Mercedes responded, "Well, those apartments aren't for program people."

39.     When Mercedes stepped away, Mr. Short decided to ask another Abba employee or agent, Carmen, about the listings in the window.  In response to Mr. Short's inquiries, Carmen explained to Mr. Short, "Those apartments don't accept HASA.  Some apartments are for HASA people, some are for regular people."  Despite Mr. Short's explicit requests, then, no one at Abba showed Mr. Short any of the listings in the window.

**FHJC Testing Investigation of Abba**

40.     On January 24, 2011, a female tester employed by FHJC called Abba looking for a one-bedroom apartment for rent up to $1,100 a month.  The tester spoke with one of Abba's employees or agents named Israel, who asked about the tester's credit and income.  Israel informed the tester that he had a one-bedroom apartment within her price range in the Prospect Heights/Crown Heights area (on St. Mark's) available immediately, with no broker's fee.  He

11

informed the tester that after he ran her credit, if she put a deposit on the apartment, she could sign a lease "this weekend."

41.     Later that same day, the same female tester called Israel again and told him that she was no longer interested in the apartment, but her disabled brother, a HASA client, might be. Israel informed the tester: "Me, personally, I don't deal with that, but there is someone in the office who does deal with that." He then told the tester to call Abba back and ask for Mercedes, adding: "She's the agent who deals with the HASA program."

42.     The tester then asked Israel if the one-bedroom apartment that they discussed would be available to a HASA client. Israel responded that he wasn't sure how the HASA program worked, and again suggested that the tester deal with Mercedes, adding: "She would know all the listings for HASA."

43.     Later that same day, the same female tester called Abba per Israel's instructions and spoke with Mercedes, an Abba employee or agent. Mercedes confirmed Israel's comment that she was the agent who deals with HASA, and asked the tester, "What do you have, straight HASA or SSI/SSD?" She added, "I need to know this, because that makes a difference." The tester explained that she was inquiring on behalf of her brother, a HASA client.

44.     When the tester began to inquire about the one-bedroom apartment on St. Marks (Israel's listing), Mercedes interrupted: "No. I have to, I have to see what, you know, what I have available, if it's a one-bedroom or not. . . . Let him come see me, my name is Mercedes, and he can bring me all his paperworks [*sic*], meaning the HASA award letter, or the budget letter, plus the SSD – the disability budget letter – uh, I need the social security card and a photo ID." Mercedes later added: "I'll run his credit. If everything is good, then I'll tell him what I have available. . . ."

45.     Later that same day, the same female tester called Mercedes again, and inquired once more about the one-bedroom apartment on St. Marks, asking if that landlord would accept HASA. Mercedes responded: "Let me find out. I don't know. But, uh, in either case, your brother would have to come see me with all the paperwork. And give him the address, and when he comes to see me, if they do, then, you know, I'll make sure he gets sent."

46.     The tester then asked, "So, some of the properties you have do take it [HASA], and some don't?" Mercedes responded, "Yes. Yes. Yes. Yes."

47.     On March 31, 2011, a male, non-disabled tester employed by FHJC visited Abba looking for a one-bedroom apartment for rent under $1,200 per month. The non-disabled male tester spoke with Israel, the same Abba employee or agent who spoke to the female FHJC tester in January. Israel asked the non-disabled male tester about the tester's credit and income. The tester responded that his credit was good and that he earned around $41,000 per year from employment. Israel stated, "I have a one-bedroom for 1,100." Israel explained that the apartment was located on St. Marks and Utica Avenue and was available "right away." Israel showed the tester photographs of the apartment, and took the tester to see the apartment on St. Marks.

48.     That same day, March 31, 2011, a female tester employed by FHJC was assigned to visit Abba and inquire about a one-bedroom apartment for her son, a HASA client. The tester went to Abba's office and was greeted by an unnamed Abba employee or agent, to whom the tester explained that she was inquiring about an apartment she had seen on Craigslist. The unnamed Abba employee or agent asked the tester: "You're not receiving any government assistance or anything like that, right? Or are you? Like pension or . . . ?"

49.     The female tester stated that her son was living with HIV and was with the HASA

13

program.  The unnamed Abba employee or agent asked if the tester could fill out an application on behalf of her son, and then stated:  "Well, we have an agent who handles that, that's Mercedes.  Let me give you her, let me give you this application. . . . You can ask her as many questions as you like."

50.     The female tester then met with Mercedes and again asked whether the apartment listed on Craigslist for $1,100 was still available, "or are there more like that?"  Mercedes responded, "I don't [think] these, they accept program, this is not for program."  The tester asked, "This particular . . .," whereupon Mercedes responded, "Yeah.  Talk to me a little bit about your son.  This is not in program [*sic*], because I don't have it.  But, talk to me, let me see what I can do for him."

51.     When the tester explained to Mercedes that HASA would pay up to $1,150 per month, Mercedes responded, "It doesn't matter.  Because nowadays the landlords have had so much grief from HASA client [*sic*] that a lot of them don't even want to accept this program." She added, "But they're willing to do it if they see the client is good."

52.     Mercedes then informed the female tester that the $1,100 apartment listed on Craigslist was not available for the tester's son, since it was not listed among the apartments in Mercedes' portfolio, i.e., those landlords willing to accept clients receiving a HASA subsidy.  Mercedes explained, "No.  I don't have it, so this is out."  She added, "This is probably for working [people].  I'll find out."

53.     The female tester informed Mercedes that an "Ava" was listed on the Craigslist advertisement.  Mercedes responded, "So call Ava.  But I'm telling you, this is not for program [*sic*].  But you can call her, that's the agent."

54.     A short time later during the same meeting, Mercedes told the female tester that

14

she wanted to see the tester's disabled son, stating, "And it would be nice if I could physically

see him . . . because I need to see what he looks like." Mercedes never did show the tester the

$1,100 apartment advertised on Craigslist.

**Soni's Blatant Discrimination Against Mr. Short**

55.     In or about November 2010, Mr. Short called Soni to inquire about available one-

bedroom apartments for rent. The agent at Soni, Jose Peña, told Mr. Short that he had one-

bedroom apartments available and asked Mr. Short where he worked. When Mr. Short explained

to Mr. Peña that he would be using HASA to pay his rent, Mr. Peña told Mr. Short, "Don't even

come to the office unless you have three paystubs." When Mr. Short tried to tell Mr. Peña that

HASA would pay his rent, Mr. Peña told Mr. Short that only verifiable working people were

considered for apartments. Mr. Peña thus refused to assist Mr. Short any further with his

housing search.

**FHJC Testing Investigation of Soni and Kimberly Place**

56.     On January 24, 2011, a female tester employed by FHJC telephoned Soni to

inquire about renting a one-bedroom apartment for up to $1,100 per month, stating that she was

employed as a librarian. Soni's employee or agent, Jose Peña, told the tester that there was a

one-bedroom apartment on Madison Avenue between 128th and 129th Streets available for $1,000

per month.

57.     Later in the day, the same female tester called Mr. Peña at Soni a second time to

tell him that she had found an apartment, but that her brother – who has disabilities and a rental

subsidy from HASA – was also looking for a one-bedroom apartment and that he might be

interested in the apartment on Madison Avenue. When the tester asked if the apartment might be

available for her brother, Mr. Peña stated, "Uh, no at this moment." He added, "I have low

income apartments on Harlem [*sic*]."

58.     The tester then asked Mr. Peña, "But you don't do H-A-S-A?" He replied, "No, no. I can't. I don't do that now."

59.     On April 1, 2011, a male non-disabled tester employed by FHJC visited Soni's office at 5041 Broadway in Manhattan and met with Soni's employee or agent Jose Peña. The tester asked Mr. Peña about one-bedroom apartments available for rent under $1,200 per month. The tester brought with him a print-out of apartments from the internet, some of which were listed under the names of various real estate companies, including Soni. The print-out included a listing for a one-bedroom apartment for $1,100 per month. Mr. Peña asked the tester, "You are a working client or do you have any help to pay the rent?" The tester indicated that his income from employment was $41,000 per year, and Mr. Peña said that the minimum income for an apartment renting for $1,100 per month would be $40,000 per year.

60.     After calling another office and confirming that there was a one-bedroom apartment available at 5056 Broadway in Manhattan for $1,100 per month, Mr. Peña took the non-disabled male tester outside to get the key from a company that he later described as "M & N." In particular, when the tester asked if this was a different company than the one Mr. Peña worked for, Mr. Peña replied, "This is M & N. They are a management company." After obtaining the key from M&N, Mr. Peña took the tester to see the apartment, which was located across the street from Soni. After showing the apartment, a fifth-floor walk-up, Mr. Peña gave the tester an M & N Management Corporation application.

61.     Upon information and belief, M & N Management Corporation has an office at 5047 Broadway, which is located next door to Soni and across the street from the apartment building located at 5056 Broadway, where Mr. Peña showed the non-disabled tester an

apartment.

62.     According to the New York State Department of State, the office of M & N Management Corporation located at 5047 Broadway serves as the Principal Executive Office for Defendant Kimberly Place.  In addition, Nikitas Drakotos is the Chief Executive Officer of both Defendant Kimberly Place and M & N Management Corporation.

63.     On April 4, 2011, three days later, a female tester employed by FHJC visited Soni's office at 5041 Broadway in Manhattan to inquire about the availability of a one-bedroom apartment for rent up to $1,150 per month for her disabled son.  The female tester met with Soni's employee or agent, Jose Peña, who told her that there was an available fifth-floor, walk-up, one-bedroom apartment across the street from his office, renting for $1,100 per month.  Upon information and belief, Mr. Peña was referring to the same apartment that he showed the non-disabled employed male tester who visited Soni on April 1, 2011.   After learning that the female tester's son was receiving HASA benefits, however, Mr. Peña stated that the apartment was not available for programs, and that he did not currently have any apartments that took programs.

64.     In particular, Mr. Peña informed the female tester, "we don't take any programs on the apartment."  The tester responded, "Oh, this landlord doesn't take any programs?" to which Mr. Peña replied, "No, not only [that], but you have to be working, straight working, a minimum of thirty-eight, forty thousand a year.  I don't have it on [*sic*] this area any apartment for a city program or something."  Similarly, Mr. Peña stated, "no HASA," and explained that there was "nothing at all in this area anywhere.  I don't have anything now."  He concluded, "But, uh, no, nothing is available now for . . . I know HASA.  It's a good program, really it's good, but nothing, nothing is available at this time.  For this apartment, it's not for programs at all."

65.     Upon information and belief, Jose Peña was acting as an agent on behalf of Defendant Kimberly Place, the owner of 5056 Broadway, on April 1 and 4, 2011 when Mr. Peña met with testers sent by FHJC.

66.     As of April 2011, Mr. Short had not yet rented an apartment with his HASA subsidy and was continuing his search for an apartment. The apartment at 5056 Broadway was within the price range typically approved by HASA.

**Askarinam's Blatant Discrimination Against Mr. Short**

67.     On November 17, 2010, Mr. Short saw a sign with a telephone number for Askarinam on a building in Brooklyn. That day, he called Askarinam and spoke with a man who said his name was Michael Askarinam, the broker, and upon information and belief, is the Defendant Saeed M. Askarinam. Mr. Askarinam informed Mr. Short that he had plenty of one-bedroom apartments to offer within Mr. Short's price range. Mr. Askarinam then asked Mr. Short if he was working. Mr. Short informed Mr. Askarinam that he had a housing subsidy from HASA to pay his rent. Mr. Askarinam replied that "the landlords do not accept people on programs," and thus provided Mr. Short with no further assistance in securing one of the many one-bedroom apartments in his price-range reportedly available.

**FHJC Testing Investigation of Askarinam**

68.     On January 24, 2011, a non-disabled male tester employed by FHJC called Askarinam to inquire about a one-bedroom apartment for rent up to $1,100 and spoke with a woman named Melanie. Askarinam employee or agent Melanie informed the tester, "we have apartments available" in the price range of $900 to $1,100 per month. "We have stuff available now," she added.

69.     Later that day, the same tester called Askarinam and spoke with a man who said

his name was Michael Askarinam and who upon information and belief is Defendant Saeed M.
Askarinam.  The tester explained to Mr. Askarinam that he was looking for a one-bedroom
apartment, renting up to $1,100 per month.  Mr. Askarinam replied, "No problem.  We have
that."  He added, "We work with more than 75 buildings."

70.     Mr. Askarinam then asked, "Are you a working person?  You have good income,
good credit?"  When the tester answered in the affirmative, Mr. Askarinam stated, "I'd be happy
to show you what we got," later adding, "we have a lot of choices for you."  "All you need to
do," Mr. Askarinam informed the non-disabled employed tester, "is just come to the office, we'll
take you we'll show you two, three, four, five, and if you like the apartment, we'll get it for you
the same day."

71.     When the non-disabled tester asked, "So, you have places that are likely available
immediately, right?" Mr. Askarinam replied, "Absolutely.  Otherwise, I won't be in this
business.  We do have a lot of buildings that we work with."  He added, "These are, for the most
part, uh, almost all of them are building, rent stabilized buildings. . . . We have a lot of good
choices."

72.     Later that same day, January 24, 2011, the same male tester again called
Askarinam and spoke with a man who said his name was Michael Askarinam and who, upon
information and belief, is the Defendant Saeed M. Askarinam.  The tester told Mr. Askarinam
that he had found another apartment, but stated that his brother, a HASA client with a disability,
was looking for a place to rent.  Mr. Askarinam stated that he was familiar with HASA, and "I'm
approved for the program," but he informed the tester, "Unfortunately, I don't have any owner
that will work with that."  He added, "The owners we workin [with], I mean, then, they want
working people [with] great credit.  They don't take any programs."  Nonetheless, Mr.

19

Askarinam reiterated to the non-disabled employed tester that he was willing to work with the tester in finding an apartment for himself: "I'm sure I can help you, because obviously you have good income good credit. We can take it from there."

73.     On April 1, 2011, a non-disabled, male tester employed by FHJC visited the offices of Askarinam in Brooklyn to inquire about one-bedroom apartments for rent. The tester met with an man who identified himself as Michael Askarinam and who upon information and belief is Defendant Saeed M. Askarinam. Mr. Askarinam informed the tester, "The owners we work with, basically, want to see if you're working full-time . . . ."

74.     The non-disabled male tester stated that he was seeking a one-bedroom apartment for under $1,199 per month. He explained that he earned $41,400 per year from employment, with some supplemental income. Mr. Askarinam offered to show the tester "one, two, three" apartments that very day. Mr. Askarinam stated, "it's all rent stabilized," adding, "We've got quite a few choices for you." Mr. Askarinam suggested to the tester that they view four, five, or six apartments together the upcoming Sunday.

75.     On the same day, April 1, 2011, a female tester visited Askarinam's Brooklyn office to inquire about one-bedroom apartments in the price range of $1,100 to $1,150 per month, for her disabled son. The tester also met with a man who said his name was Michael Askarinam and who upon information and belief is Defendant Saeed M. Askarinam. The tester told Mr. Askarinam that her son had good credit. Mr. Askarinam asked, "is he a working guy?" The tester explained that her son was not, but that he used to work. She explained that her son had a disability, was a HASA client, and "they pay the whole rent."

76.     Mr. Askarinam replied, "HASA is a very good program," and added, "I'm licensed to work with HASA." He added, "That's the good news. The bad news is that a lot of

landlords we work with, they don't accept any program.  They don't just want to, you know, they just want working people, good income, good credit.  That's how they do it."  The tester asked, "Even though his credit is good?"  Mr. Askarinam responded in the affirmative.

77.     Mr. Askarinam later added, "your choice with us is very limited, because for one thing, the owners we work with, they don't accept HASA."  "Your goal," he explained to the tester, "is to really should [*sic*] look for an owner that will accept the HASA program."

## GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

78.     As alleged in the foregoing paragraphs, Defendants have intentionally and willfully discriminated against the Plaintiffs and acted with reckless disregard for the rights of the Plaintiffs on the basis of disability and lawful source of income.

79.     As alleged in the foregoing paragraphs, Defendants' refusal to show apartments and negotiate for the rental of apartments with persons who participate in the HASA housing subsidy program has a disparate impact on individuals with disabilities.

80.     By reason of the foregoing, Mr. Short was unable to rent an apartment and remained homeless for several months.

81.     By reason of the foregoing, Mr. Short has been injured by Defendants' discriminatory conduct and has sustained compensatory damages as a result of the Defendants' conduct including economic injury, a loss of his civil rights, and other damages including emotional distress, humiliation, and embarrassment.

82.     By reason of the foregoing, the FHJC has been injured by Defendants' discriminatory conduct in the form of a diversion of its resources and frustration of its mission, including staff time expended to respond to Defendants' discriminatory conduct and to assist Mr. Short with his search for affordable housing.

83. At or before the commencement of this action, Plaintiffs provided notice of this action to the New York City Commission on Human Rights and Corporation Counsel, pursuant to the New York City Administrative Code § 8-502(c).

## FIRST CLAIM FOR RELIEF
(Fair Housing Act: 42 U.S.C. § 3604(c))

84. Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth

85. Plaintiff Keith Short is a person with a "handicap" within the meaning of the Fair Housing Act ("FHA"), 42 U.S.C. § 3602(h).[1]

86. The FHA provides that it is illegal: "To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

87. Defendants Manhattan, Abba, Soni, and Askarinam violated this provision by making and/or causing to be made statements to Plaintiffs with respect to the rental of dwellings that indicated preferences, limitations, and/or discrimination, and an intention to make such preference, limitation, and/or discrimination, based on disability.

88. The conduct of Defendants Manhattan, Abba, Soni, and Askarinam was willful, intentional, and in reckless disregard of Plaintiffs' civil rights.

89. Plaintiffs Short and FHJC are aggrieved persons as defined by the FHA, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct have sustained damages.

---

[1] Hereinafter, the term "disability" shall be used for the term "handicap."

22

90.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
(Fair Housing Act:  42 U.S.C. § 3604(d))

91.     Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

92.     The FHA provides that it is illegal:  "To represent to any person...that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available" because of disability.  42 U.S.C. § 3604(d).  This provision includes "limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental" because of disability.  28 C.F.R. Part 100.80(b)(4).

93.     Defendants violated this provision by limiting the information they provided to the Plaintiffs because of disability about suitably priced apartments that were in fact available for inspection and rental.

94.     Defendants' conduct was willful, intentional, and in reckless disregard of the Plaintiffs' civil rights.

95.     Plaintiffs Short and FHJC are aggrieved persons as defined by the FHA, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct have sustained damages.

96.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
(Fair Housing Act:  42 U.S.C. § 3604(f)(1))

97.     Plaintiffs restate and incorporate by reference the preceding paragraphs above as

if fully set forth herein.

98.     The FHA provides that it is illegal: "To discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter" because of disability.  42 U.S.C. § 3604(f)(1).

99.     Defendants illegally discriminated against Plaintiffs by discriminating in the rental of or otherwise making unavailable or denying apartments for rent because of disability, including, but not limited to, a) refusing to provide information about apartments available for rent; b) refusing to show apartments available for rent; and/or c) failing to provide applications and information about the application process for apartments available for rent.

100.    Defendants' conduct was willful, intentional, and in reckless disregard of the Plaintiffs' civil rights.

101.    Mr. Short and FHJC are aggrieved persons as defined by the FHA, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct have sustained damages.

102.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
(Fair Housing Act:  42 U.S.C. § 3604(f)(2))

103.    Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

104.    The FHA provides that it is illegal: "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling" because of disability.  42 U.S.C. § 3604(f)(2).

24

105.    Defendants illegally discriminated against Plaintiffs by discriminating in the terms and conditions of renting apartments because of disability, including, but not limited to, a) imposing rental conditions that require employment and/or no HASA housing subsidy; b) maintaining segregated apartment listings; and/or c) requiring persons with disabilities to personally visit the real estate office as a precondition to being told about available apartments for rent.

106.    Defendants' conduct was willful, intentional, and in reckless disregard of the Plaintiffs' civil rights.

107.    Mr. Short and FHJC are aggrieved persons as defined by the FHA, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct have sustained damages.

108.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
(New York City Human Rights Law:  Disability Discrimination)

109.    Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

110.    Defendants Manhattan, Abba, Soni, and Askarinam are real estate companies licensed by the State of New York to broker the rental of apartments.  Each of these Defendants has salespersons, employees, or agents who act on each of these Defendant's behalf and on behalf of various owners of residential real estate to broker the rental of apartments, including on behalf of Defendant Kimberly Place Realty Corp.

111.    Section 8-107(5)(c) of the New York City Administrative Code provides that it

shall be "an unlawful discriminatory practice for any real estate broker, real estate salesperson or employee or agent thereof:  (1) To refuse to sell, rent or lease any housing accommodation, land or commercial space or an interest therein to any person or group of persons or to refuse to negotiate for the sale, rental or lease, of any housing accommodation, land or commercial space or an interest therein to any person or group of persons because of the actual or perceived . . . disability . . . of such person or persons, . . . or otherwise to deny or withhold any housing accommodation, land or commercial space or an interest therein or any facilities of any housing accommodation, land or commercial space or an interest therein from any person or group of persons because of the actual or perceived . . . disability . . . of such person or persons . . . ."

112.    Defendants Manhattan, Abba, Soni, and Askarinam violated Section 8-107(5)(c) by a) refusing to rent or negotiate for the rental of housing accommodations to Plaintiffs; and b) otherwise denying or withholding housing accommodations from the Plaintiffs because of disability.

113.    Defendants' conduct was willful, intentional, and in reckless disregard for the Plaintiffs' rights.

114.    Plaintiffs are "aggrieved persons," as defined in the New York City Administrative Code, § 8-502(a), and have suffered damages as a direct and proximate result of Defendants' discriminatory conduct.

115.    Accordingly, under New York City Administrative Code §§ 8-502(a) and (f), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
(New York City Human Rights Law:  Disability Discrimination)
Kimberly Place Realty Corp. Only

116.    Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

117.    Defendant Kimberly Place is the owner and lessor of a housing accommodation located in Manhattan at 5056 Broadway in the City of New York, as defined by Section 8-102(10) of the New York City Administrative Code to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

118.    Section 8-107(5)(a) of the New York City Administrative Code provides that it shall be "an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignees, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation . . . (1) To refuse to sell, rent or lease, or approve the sale, rental or lease of a housing accommodation or otherwise deny to or withhold from any person or group of persons such a housing accommodation . . .because of the actual or perceived . . . disability . . . of such person or persons."

119.    Defendant Kimberly Place violated Section 8-107(5)(a) by adopting policies that deny or withhold apartments for rent at 5056 Broadway because of disability.

120.    Defendant's conduct was willful, intentional, and in reckless disregard for the Plaintiffs' rights.

121.    Plaintiffs are "aggrieved persons," as defined in the New York City Administrative Code, § 8-502(a), and have suffered damages as a direct and proximate result of Defendant's discriminatory conduct.

122.    Accordingly, under New York City Administrative Code §§ 8-502(a) and (f),

27

Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs.

### SEVENTH CLAIM FOR RELIEF
(New York City Human Rights Law: Source of Income Discrimination)

123.   Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

124.   Section 8-107(5)(c) of the New York City Administrative Code provides that it shall be "an unlawful discriminatory practice for any real estate broker, real estate salesperson or employee or agent thereof: (1) To refuse to negotiate for the sale, rental or lease, of any housing accommodation . . . because of . . . any lawful source of income of such person . . . or otherwise to deny or withhold any housing accommodation . . . or an interest therein . . . because of any lawful source of income of such person . . . (2) . . . to use any form of application for the purchase, rental or lease of any housing accommodation, land or commercial space or an interest therein or to make any record or inquiry in connection with the prospective purchase, rental or lease of any housing accommodation, land or commercial space or an interest therein which expresses, directly or indirectly, any limitation, specification or discrimination as to . . . any lawful source of income . . . ."

125.   Defendants Manhattan, Abba, Soni, and Askarinam violated Section 8-107(5)(c) by discriminating against Plaintiffs, including, but not limited to, a) refusing to rent or negotiate for the rental of housing accommodations to Plaintiffs; b) otherwise denying or withholding housing accommodations to Plaintiffs; and c) making an inquiry of Plaintiffs in connection with the prospective rental of a housing accommodation which expressed a limitation, specification, or discrimination based on source of income.

126.   Defendants' conduct was willful, intentional, and in reckless disregard for the Plaintiffs' rights.

127.   Plaintiffs are "aggrieved persons," as defined in the New York City Administrative Code, § 8-502(a), and have suffered damages as a direct and proximate result of Defendants' discriminatory conduct.

128.   Accordingly, under New York City Administrative Code §§ 8-502(a) and (f), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
(New York City Human Rights Law:  Source of Income Discrimination)
Kimberly Place Realty Corp. Only

129.   Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

130.   Section 8-107(5)(a) of the New York City Administrative Code provides that it shall be "an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignees, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation . . . (1) To refuse to sell, rent or lease, or approve the sale, rental or lease of a housing accommodation or otherwise deny to or withhold from any person or group of persons such a housing accommodation" because of source of income.

131.   Defendant Kimberly Place violated Section 8-107(5)(a) by adopting policies that deny or withhold apartments for rent at 5056 Broadway because of source of income.

132.   Defendant Kimberly Place's conduct was willful, intentional, and in reckless disregard for the Plaintiffs' rights.

133.   Plaintiffs are "aggrieved persons," as defined in the New York City

29

Administrative Code, § 8-502(a), and have suffered damages as a direct and proximate result of Defendant's discriminatory conduct.

134.    Accordingly, under New York City Administrative Code §§ 8-502(a) and (f), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

(a)    Declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*. and the New York City Administrative Code § 8-107 *et seq*.;

(b)    Enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from:

(i)    Denying or withholding housing, or otherwise making housing unavailable on the basis of disability or lawful source of income;

(ii)    Making, printing or publishing any statement with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of disability or lawful source of income;

(iii)    Making any record or inquiry in connection with the prospective purchase, rental or lease of any housing accommodation which expresses, directly or indirectly, any limitation, specification or discrimination as to disability or lawful source of income;

(iv)     Representing to any person because of disability or lawful source of income that a dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available and limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental because of disability or lawful source of income;

(v)     Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling because of disability or source of income;

(vi)     Aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by the New York City Human Rights Law; and

(vii)     Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any rights granted or protected by the Fair Housing Act.

(c)     Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

(i)     Make all necessary modifications to their policies, practices, and procedures to comply with fair housing laws;

(ii)     Train all management, agents, and employees on fair housing laws;

(iii)     Display an Equal Opportunity logo (or statement to that effect) on

31

all advertisements for rental property and display HUD, state, and local fair housing posters in all offices;

(iv) Allow monitoring of their advertising, listings, showing of apartments, application process, and rental decisions;

(v) Retain records to allow for appropriate monitoring;

(vi) Develop written procedures on rental process and fair housing policy to be distributed to all staff, tenants, and rental applicants; and

(vii) Establish a system so that their employees and agents can be tested for unlawful discriminatory practices;

(d) Awarding such damages to Plaintiff Keith Short as will fully compensate him for any economic loss, loss of rights, as well as for the humiliation, embarrassment, and emotional distress suffered due to Defendants' discriminatory conduct;

(e) Awarding such damages to Plaintiff FHJC as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

(f) Awarding punitive damages to Plaintiffs;

(g) Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

(h) Granting Plaintiffs such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial on the merits by jury pursuant to Fed.R.Civ.P. 38.

Dated: August 25, 2011
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:    _Diane L. Houk_

DIANE L. HOUK (DH 5202)
75 Rockefeller Plaza, 20th Floor
New York, NY  10019
(212) 763-5000

HOUSING WORKS, INC.

By:    _Armen H. Merjian_

ARMEN H. MERJIAN (AM 3985)
320 W. 13th Street, 4th Floor
New York, NY  10014
(212) 645-8111, ext. 4167

Attorneys for Plaintiffs