UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEITH SHORT and FAIR HOUSING JUSTICE
CENTER, INC.,

                         Plaintiffs,

      - against -

MANHATTAN APARTMENTS, INC., ABBA
REALTY ASSOCIATES, INC., SONI REALTY
LLC, KIMBERLY PLACE REALTY CORP., and
SAEED M. ASKARINAM d/b/a ASKARINAM
REALTY,

                         Defendants.

11 Civ. 05989 (KMW)

**PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW**

HOUSING WORKS, INC.
Armen H. Merjian
320 W. 13th Street, 4th Floor
New York, NY 10014
(212) 645-8111 x4167
New York, N.Y. 10018

EMERY CELLI BRINCKERHOFF AND ABADY LLP
Diane L. Houk
75 Rockefeller Plaza, Floor 20
New York, N.Y. 10019
(212) 763-5000

*Attorneys for Plaintiffs*

DATED:  October 9, 2012

**TABLE OF CONTENTS**

PAGE NO(s):

TABLE OF AUTHORITIES ................................................................................ iii-vi

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ................................................................................ 2

    I.    FACTS RELATING TO DEFENDANT
            MANHATTAN APARTMENTS, INC. ................................................ 4

    II.   FACTS RELATING TO DEFENDANT
            ABBA REALTY ASSOCIATES, INC. ............................................ 10

    III.  INJURIES SUSTAINED BY PLAINTIFFS ................................... 17

            A.    Keith Short ................................................................... 17

            B.    Fair Housing Justice Center ........................................ 19

ARGUMENT ................................................................................ 21

    I.    THE PROVISIONS OF THE FAIR HOUSING ACT ARE
            TO BE GIVEN A BROAD AND LIBERAL CONSTRUCTION. ....... 21

    II.   PLAINTIFF FHJC HAS STANDING
            UNDER THE FAIR HOUSING ACT. ............................................ 21

    III.  PLAINTIFFS HAVE AMPLY SUBSTANTIATED
            THEIR CLAIMS UNDER THE FAIR HOUSING ACT ................... 23

            A.    Fair Housing Act, 42 U.S.C. § 3604(f)(1). ............................... 26

                   1.    MA ................................................................... 27

                   2.    Abba ................................................................ 28

            B.    Fair Housing Act, 42 U.S.C. § 3604(d) ................................. 29

            C.    Fair Housing Act, 42 U.S.C. § 3604(f)(2) ............................. 32

            D.    Fair Housing Act, 42 U.S.C. § 3604(c) – as to Abba Only ....... 33

    IV.  UNDER THE RESTORATION ACT OF 2005, THE CITY
            HUMAN RIGHTS LAW EXPRESSLY REQUIRES AN
            INDEPENDENT ANALYSIS AND LIBERAL CONSTRUCTION
            IN ALL CIRCUMSTANCES, EVEN WHERE STATE
            AND FEDERAL HUMAN RIGHTS LAWS HAVE
            COMPARABLE LANGUAGE. ................................................ 34

    V.   PLAINTIFFS HAVE AMPLY SUBSTANTIATED THEIR
            CLAIMS UNDER THE CITY HUMAN RIGHTS LAW. ................... 37

            A.    City Human Rights Law: Disability Discrimination,
                 § 8-107(5)(c). ................................................................ 37

i

B.    City Human Rights Law: Lawful Source of Income
Discrimination, § 8-107(5)(c) ................................................... 38

1.    MA ............................................................................. 39

2.    Abba .......................................................................... 41

VI.    PLAINTIFFS ARE ENTITLED TO COMPENSATORY
DAMAGES. ........................................................................... 44

VII.    PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES. ........................... 45

VIII.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF ............................. 47

CONCLUSION ................................................................................................ 49

# TABLE OF AUTHORITIES

**PAGE NO(s)**:

## FEDERAL CASES

*Broome v. Biondi*,
  17 F. Supp. 2d 211 (S.D.N.Y. 1997) ........................................................ 44

*Cabrera  v. Jakabovitz*,
  24 F.3d 372 (2d Cir. 1994) ...................................................... 23, 30, 31

*Cabrera v. Jakabovitz*,
  814 F. Supp. 269 (E.D.N.Y. 1993) ........................................................ 47

*Cales v. New Castle Hill Realty*,
  No.10-CV-03426, 2011 WL 335599 (S.D.N.Y. Jan. 31, 2011) ........................................ 23, 31

*City of Edmonds v. Oxford House, Inc.*,
  514 U.S. 725 (1995) ........................................................ 21

*Dillon v. AFBIC Development Corporation*,
  597 F.2d 556 (5th Cir. 1979) ........................................................ 23

*Fair Housing Justice Center v. Broadway Crescent Realty*,
  No. 10-CV-00034, 2011 WL 856095 (S.D.N.Y. March 9, 2011) .......................... 30, 31

*Fair Housing Justice Center v. Edgewater Park Owners Cooperative*,
  No. 10-CV-00912, 2012 WL 762323 (S.D.N.Y. March 9, 2012) ...................... 23, 31

*Grant v. Smith*,
  574 F.2d 252 (5th Cir. 1978) ........................................................ 26

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................ 21, 27, 30

*Huntington Branch, NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988) ........................................................ 24, 25

*Jeanty v. McKey*,
  496 F.2d 1119 (7th Cir. 1974) ........................................................ 24

*Johnson v. Jerry Pals Real Estate*,
  485 F.2d 528 (7th Cir. 1973) ........................................................ 27

*Loeffler v. Staten Island Univ. Hosp.*,
  582 F.3d 268 (2d Cir. 2009) ........................................................ 36

*Meyer v. Holley*,
  537 U.S. 280 (2003) ........................................................ 23

*New York Civil Liberties Union v. N.Y. City Transit Authority*,
  652 F.3d 247 (2d Cir. 2011) ........................................................ 21

*Nnebe v. Daus,*
  644 F.3d 147 (2d Cir. 2011) ......................................................................... 21

*Northside Realty Associates, Inc. v. U.S.,*
  605 F.2d 1348 (5th Cir. 1979) ...................................................................... 30

*Open Housing Center v. Kessler Realty,*
  No. 96-CV-06234, 2001 WL 1328446 (E.D.N.Y. Sept. 18, 2001) ......................... 30

*Portee v. Hastava,*
  853 F. Supp. 597, 609, 612-16 (E.D.N.Y. 1994) *on reconsideration*, (June 14, 1994),
  *judgment aff'd.* 104 F.3d 346 (2d Cir. 1996) ................................................... 44

*Ragin v. Harry Macklowe Real Estate,*
  6 F.3d 898 (2d Cir. 1993) ........................................................................... 21

*Reyes v. Fairfield Properties,*
  661 F. Supp. 2d 249 (E.D.N.Y. 2009) ........................................................... 23

*Rogers v. 66-36 Yellowstone Blvd. Co-op Owners, Inc.,*
  599 F. Supp. 79 (E.D.N.Y. 1984) ................................................................. 47

*Seaton v. Sky Realty Co. Inc.,*
  491 F.2d 634 (7th Cir. 1974) ...................................................................... 44

*Smith v. Wade,*
  461 U.S. 30 (1983) .................................................................................... 45

*Southern California Housing Rights Center v. Krug,*
  564 F. Supp. 2d 1138 (C.D. Cal. 2007) ......................................................... 47

*Trafficante v. Metropolitan Life Insurance Co.,*
  409 U.S. 205 (1972) .................................................................................. 21

*Tsombanidis v. West Haven Fire Dep't,*
  352 F.3d 565 (2d Cir. 2003) ....................................................................... 25

*U.S. v. Space Hunters, Inc.,*
  429 F.3d 416 (2d Cir. 2005) ............................................................ 30, 31, 46

*U.S. v. Youritan Construction Co.,*
  370 F. Supp. 643 (N.D. Cal. 1973), ......................................................... 27, 30

*Warth v. Seldin,*
  422 U.S. 490 (1975) .................................................................................. 21

*Wharton v. Knefel,*
  562 F.2d 550 (8th Cir. 1977) ...................................................................... 30

*Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.,*
  429 F. Supp. 486 (E.D.N.Y. 1977) ............................................................... 27

*Zuch v. Hussey,*
  394 F. Supp. 1028 (E.D.Mich. 1975) ............................................................ 30

## STATE CASES

*Albunio v. City of New York*,
    16 N.Y.3d 472 (2011)...................................................................................... 35, 38

*Bumpus v. New York City Transit Auth.*,
    18 Misc. 3d 1131A, 859 N.Y.S.2d 893 (Sup. Ct., Kings County 2008),
    *aff'd* 66 A.D.3d 26, 883 N.Y.S.2d 99 (2d Dep't 2009) ............................................ 35

*Jordan v. Bates Advertising Holdings, Inc.*,
    11 Misc. 3d 764, 816 N.Y.S.2d 310 (Sup. Ct., N.Y. County 2006) ........................ 35

*Levin v. Yeshiva University, et al.*,
    96 N.Y.2d 484 (2001)....................................................................................... 37

*Nelson v. HSBC Bank USA*,
    87 A.D.3d 996, 929 N.Y.S.2d 261 (2nd Dep't 2011) ........................................... 36

*Vig v. New York Hairspray Co.*,
    885 N.Y.S.2d 74 n.6 (1st Dep't 2009) .............................................................. 36

*Williams v. New York City Housing Auth.*,
    61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dep't 2009)............................................... 36

## FEDERAL STATUTES

42 U.S.C. § 3601 ............................................................................................... 21

42 U.S.C. § 3602(h) ........................................................................................... 24

42 U.S.C. § 3604(c) .................................................................................. 24, 33, 34

42 U.S.C. § 3604(d) .................................................................................. 29, 30, 32

42 U.S.C. § 3604(f)(1) .............................................................................. 26, 28, 29

42 U.S.C. § 3604(f)(2) ....................................................................................... 32

42 U.S.C. § 3613(c)(1) ............................................................................. 44, 45, 47

## FEDERAL REGULATIONS

24 C.F.R. § 180.670(b)(3)(i) .............................................................................. 44

28 C.F.R. § 100.80(b)(4) .................................................................................... 30

## OTHER AUTHORITIES

N.Y. City Admin. Code § 8-107(5)(c) ....................................................... 37, 38, 39

N.Y. City Admin. Code § 8-107(13)(a) ................................................................ 36

N.Y. City Admin. Code § 8-107(13)(d) ................................................................ 37

N.Y. City Admin. Code § 8-107(13)(e) ................................................................ 37

N.Y. City Admin. Code § 8-130 ................................................................... 34, 38

N.Y. City Admin. Code § 8-502(a)......................................................................... 44, 45, 47

Plaintiffs Keith Short and Fair Housing Justice Center, Inc. submit this Pre-Trial Memorandum of Law.

## PRELIMINARY STATEMENT

Plaintiff Keith Short is a 46 year-old, indigent, disabled man living with AIDS and a host of attendant maladies.  After moving to New York from Washington, D.C. in September 2010, Mr. Short, who was homeless, became a client of the New York City HIV/AIDS Services Administration.  To qualify for HASA, a client must be indigent and living not merely with HIV, but with clinical/symptomatic HIV illness, or AIDS.

As a homeless HASA client, upon finding an apartment, Mr. Short was entitled to a rental housing subsidy from HASA.  Approved for HASA, Mr. Short began searching for an apartment within the price range allowed by HASA.  Mr. Short's search for a home led him to Defendants, real estate companies that, among other things, refused to rent, refused to negotiate for the rental of, or otherwise denied an apartment to Mr. Short because he is disabled and because of his source of income, in violation of the Fair Housing Act and the New York City Human Rights Law.  As a result of this discrimination, Mr. Short remained homeless for many months, unable to secure permanent housing, a critical element in the health and well-being of a person living with AIDS.

Plaintiff Fair Housing Justice Center ("FHJC") is a non-profit, New York City-based organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City region.  In response to Mr. Short's request for help, FHJC conducted fair housing tests that confirmed Mr. Short's allegations of discrimination.  Indeed, as the Statement of Facts, *infra*, reveals, Mr. Short's allegations of discrimination were fully corroborated not only

by the FHJC tests, but by a wealth of supporting evidence adduced during discovery.  That evidence demonstrates that Defendant Manhattan Apartments, Inc. refused altogether to show or negotiate to rent an apartment once its employee/s or agent/s learned that renters seeking an apartment had a disability, were not working because of a disability, and/or had a housing subsidy from HASA.  Meanwhile, Defendant Abba Realty Associates, Inc. would show or negotiate to rent an apartment with respect to only some of the apartments in its portfolio once it learned this information, and only after obtaining a completed application, a credit check, and other information from the prospective applicants.  This stands in sharp contrast to Abba's treatment of employed applicants, to whom they provided information about advertised apartments and showed those apartments, operating a segregated system of brokering apartment rentals.

The evidence is clear that Defendants discriminated against Plaintiffs willfully, wantonly, and/or with reckless disregard, warranting an order of compensatory damages, punitive damages, and injunctive relief, as more fully discussed below.

## STATEMENT OF FACTS

Plaintiff Keith Short is a 46 year-old, indigent, disabled man living with AIDS and a host of attendant maladies.  The parties have stipulated that "Keith Short is a person with a handicap and a person with a disability within the meaning of the Fair Housing Act [the "FHA"] and the New York City Human Rights Law [the "City Human Rights Law"]."  (Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated October 5, 2012 [hereinafter, "PFF"], ¶ 1.)[1]

---

[1]  For the sake of brevity, Plaintiffs respectfully refer the Court to the specific paragraphs in Plaintiffs' Proposed Findings of Fact and Conclusions of Law for full citations in support of the facts proffered in this memorandum of law.

After moving to New York from Washington, D.C. in September 2010, Mr. Short, who was homeless, became a client of the New York City HIV/AIDS Services Administration ("HASA").  To qualify for HASA, a client must be indigent and living not merely with HIV, but with clinical/symptomatic HIV illness, or AIDS.  All HASA clients are thus living with a handicap or disability within the meaning of the FHA and the City Human Rights Law.  The fact that all HASA clients are living with a disability is known by landlords and real estate agents with affordable rental apartments in New York City; indeed, the agency is named the "HIV/AIDS Services Administration."  (PFF ¶ 2.)

As a homeless HASA client, upon finding an apartment, Mr. Short was entitled to a rental housing subsidy from HASA, and that subsidy constitutes a lawful source of income within the meaning of the City Human Rights Law.  In addition, Mr. Short was entitled to have a broker's fee, security deposit, and first month's rent paid by HASA.  Approved for HASA, Mr. Short began searching for an apartment within the price range allowed by HASA.  Mr. Short's search for a home led him to Defendants, real estate companies that, among other things, refused to rent, refused to negotiate for the rental of, or otherwise denied an apartment to Mr. Short because he is disabled and because of his source of income.  As a result of this discrimination, Mr. Short remained homeless for many months, unable to secure permanent housing, a critical element in the health and well-being of a person living with AIDS.  (PFF ¶ 3.)

Plaintiff FHJC is a non-profit, New York City-based organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City region.  As part of its mission, FHJC promotes the creation of open, accessible and inclusive communities.  In response to Mr. Short's request for help, FHJC conducted fair housing tests to determine whether

Defendants would rent apartments within the price range allowed by HASA to unemployed, disabled individuals with a HASA housing subsidy.  (PFF ¶ 4.)

Testers are individuals who pose as renters or homebuyers for the purpose of obtaining information about the conduct of landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.  FHJC testers receive training on how to conduct a test, prepare a test report reflecting information obtained during the test, and use a concealed digital audio recording device to record conversations during the test.  (PFF ¶ 5.)

As discussed <u>infra</u>, FHJC testers confirmed that Defendants would not show or negotiate to rent an apartment, or would do so with respect to only some of the apartments in their portfolio, once Defendants' employee/s or agent/s learned that renters seeking an apartment had a disability, were not working because of a disability, and/or had a housing subsidy from HASA. In sharp contrast, testers who told Defendants' employee/s or agent/s that they were employed were shown available apartments without limitation and given information about apartments for rent within a similar price range.  (PFF ¶ 6.)

## I.   FACTS RELATING TO DEFENDANT MANHATTAN APARTMENTS, INC.

On January 4, 2011, Mr. Short found a suitable apartment listed by Manhattan Apartments ("MA") on Craigslist and called Robert Salsberry, an agent of MA, to inquire about the listing.  Mr. Salsberry told Mr. Short to come in to his office, stating that there were plenty of apartments in Manhattan in Mr. Short's price range of around $1100.  During this phone call, Mr. Short did not tell Mr. Salsberry that he was living with a disability or that he received a public source of income.  (PFF ¶ 7.)

On January 5, 2011, Mr. Short visited Mr. Salsberry at MA.  When Mr. Short informed Mr. Salsberry that he was a HASA client, Mr. Salsberry informed Mr. Short that "the landlords

do not want any program people, only working people."  When Mr. Short asked Mr. Salsberry

which landlords in particular felt this way, Mr. Salsberry responded, "all of them, 100%,"

whereupon Mr. Short left.  (PFF ¶ 8.)

On January 24, 2011, a female tester employed by FHJC telephoned MA and spoke with

Mr. Salsberry.  The tester, who told Mr. Salsberry she was employed, inquired about a one-

bedroom apartment for rent around $1,100 a month.  Mr. Salsberry informed her:  "I have some

apartments I can show you."  "I have a lot of apartments . . . quite a few I can show you . . . ."  He

informed the tester, "I have stuff that's available now . . . .  It's just a matter of when you could

come in?"  (PFF ¶ 9.)

Later that same day, January 24, 2011, the same tester called Mr. Salsberry to say that she

found an apartment, but was now looking on behalf of her brother, a man with a disability who

received a housing subsidy from HASA.  Mr. Salsberry informed her:  "[A]t the time right now I

don't have any um, I don't have any um, landlords that accept, uh, the vouchers right now."

"[W]e (inaudible) deal with most of the major landlords and they don't really accept those.  Most

of the smaller ones do."  The FHJC recordings made on January 24, 2011 accurately reflect the

conversations with Mr. Salsberry.  (PFF ¶ 10.)

MA has stipulated that, in fact, "[o]n January 24, 2011, Manhattan Apartments had one-

bedroom apartments available to rent in the price range of $1100 per month in its listings

database."  Mr. Salsberry has admitted that he would at times field calls at MA from prospective

applicants receiving government assistance; that he would inform them that he would get back to

them; and that he never in fact followed up with any of them.  He stated that MA required an

applicant annually to earn 40 times the monthly rent or to have a guarantor annually earning 80

times the monthly rent.  It was his understanding that MA could not assist prospective tenants

participating in government programs, who did not meet either criteria. He stated that he did not

know of any landlords with whom MA worked who would take applicants with a HASA subsidy.

(PFF ¶ 11.)

On April 1, 2011, a female tester employed by FHJC visited the offices of MA and met

with Juanita Garcia-Meadows, another agent of MA. The tester explained that she was looking

for a one-bedroom apartment on behalf of her son in the Inwood/Washington Heights area of

Manhattan in the price range of $1,100 to $1,150 a month. The tester told Ms. Garcia-Meadows

that her son was disabled, receiving Social Security Disability income, and a HASA client (the

"HASA applicant"). Ms. Garcia-Meadows informed the tester: "The only thing with HASA is

that I have to find a landlord who's gonna take that." Ms. Garcia-Meadows continued: "That's

the only thing. It's a government voucher and it's kind of like they have their own way of paying

for the apartment." "So I have to find a landlord that takes the program. Okay. So let me find

out." (PFF ¶ 12.)

Ms. Garcia-Meadows then went on her computer and began typing, informing the tester:

"Yeah, so far, the landlords, I mean, so far the landlords that we have here are not, um, affiliated

with the HASA program." "None that I have right now in the area." "[T]here's some," she

stated, "that are . . . . They do take Section 8, so I'm gonna find out if they do take the HASA.

This is almost the same thing, you know?" She then announced, however, "Unfortunately, right

now, we don't have [any landlords who rent to HASA clients]." When the tester inquired

whether Ms. Garcia-Meadows meant in the area in question or in general, Ms. Garcia-Meadows

responded, "In general." (PFF ¶ 13.)

MA has stipulated that, in fact, "[o]n April 1, 2011, Manhattan Apartments had one-

bedroom apartments available to rent for less than $1200 per month in its listings database." Ms.

Garcia-Meadows has admitted that her apparent search on the computer was a subterfuge; she did not in fact search for apartments on behalf of the HASA applicant.  She also admitted that applicants with a government housing subsidy or voucher were "different"; that the apartments on the MA computer database – all of them – were not for people "on programs"; that MA had turned away prospective renters with a housing subsidy or voucher because there were no landlords at the time willing to work with those programs; and that on the date in question, MA did not have any landlords who would take an applicant with a HASA subsidy.  She has admitted that she failed or refused to assist the HASA applicant even though there were one-bedroom apartments available for rent in MA's portfolio at the time.  (PFF ¶ 14.)

Ms. Garcia-Meadows informed the tester:  "If something comes up, I'll get back to you.  Yeah, because, um, I have to find out who accepts the program.  Yeah, which landlord is, uh, accepting."  The tester gave Ms. Garcia-Meadows her telephone number, and Ms. Garcia Meadows stated that she would get back to the tester.  No one from MA, however, including Ms. Garcia-Meadows, ever called the tester back.  (PFF ¶ 15.)

On April 1, 2011, the very same day, a male, non-disabled tester employed by FHJC also visited MA seeking a one-bedroom apartment under $1,200 a month in Manhattan.  He met with Angela Fernandes, another agent of MA, and told her he was employed, earning $41,000 a year.  Ms. Fernandes showed the tester listings and photographs of typical one-bedroom apartments in Manhattan that were available in the price range, under $1,200, and offered to show the tester the apartments.  The agent asked about the tester's salary, assets (e.g. bank accounts), job, etc., and explained the fees required.  After this meeting, Ms. Fernandes repeatedly called the employed tester to follow up and suggest dates on which to view available apartments.  The recordings

made by FHJC testers on April 1, 2011 accurately reflect the conversations that the testers had with Ms. Garcia-Meadows and Ms. Fernandes.  (PFF ¶ 16.)[2]

Jerry Weinstein, co-owner, president, and managing director of MA, admitted that there are landlords with whom MA works who do not rent to applicants receiving income from governmental programs, and that MA has at times had trouble finding landlords who will take applications from individuals participating in government programs.  He admitted that MA continues to work with such landlords and to rent their apartments to other tenants (i.e., employed applicants/those not receiving a housing subsidy), and that he has never informed such landlords that their refusal is illegal, instructed anyone else at MA to do so, or instructed MA agents not to work with landlords who apply discriminatory rental criteria.  When informed by his Rental Director that there are landlords who refuse to take programs, Mr. Weinstein tells her to do "Nothing" about it, merely to try to find another landlord who will work with the prospective applicant.  Thus, MA actually implements the discriminatory rental policies of landlords by filtering clients for them on an unequal basis and then collecting a broker's fee for each closed transaction. (PFF ¶ 17.)

During discovery, MA flouted four Court orders mandating production of documents from MA's database setting forth the requirements or criteria that landlords had established for

---

[2] Plaintiffs inadvertently inserted incorrect line numbers for the April 1, 2011 Transcript of Audio Recording by Brian Hickey in their Proposed Findings of Fact ¶ 16.  Following is Paragraph 16 with corrected line numbers:  On April 1, 2011, the very same day, a male, non-disabled tester employed by FHJC also visited MA seeking a one-bedroom apartment under $1,200 a month in Manhattan.  (See Transcript of Audio Recording by Brian Hickey, dated April 1, 2011, 3:25 p.m.)  He met with Angela Fernandes, another agent of MA (SF11), and told her he was employed, earning $41,000 a year.  (Id. at 8, line 315-317.)  Ms. Fernandes showed the tester listings and photographs of typical one-bedroom apartments in Manhattan that were available in the price range, under $1,200, and offered to show the tester the apartments.  (See, e.g., id. at 3, lines 164-165; id. at 5, lines 176-177; and id. at 6-7, lines 235-236.)  The agent asked about the tester's salary, assets (e.g. bank accounts), job, etc., and explained the fees required.  (Id. at 8-13.)  After this meeting, Ms. Fernandes repeatedly called the employed tester to follow up and suggest dates on which to view available apartments.  (Transcript of Voicemails left for Brian Hickey, dated

the apartments advertised, listed, and or closed by MA during the relevant times (the "landlord requirements").  As a result, the Court ordered that the following fact be designated as established for the purposes of this litigation:  During the period July 1, 2010 through June 30, 2011, MA's rental listing database included directives to MA from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords.  (PFF ¶ 18.)

In addition, MA has stipulated:  "From August 2010 through June 2011, Manhattan Apartments had numerous one-bedroom apartments, and on any given day, dozens of one bedroom apartments, available to rent in the price range of $1,100 per month in its listings database."  (PFF ¶ 19.)

MA did, however, produce a spreadsheet setting forth landlord requirements for all apartments rentals closed by MA during the relevant period.  Given that MA manufactured this spreadsheet post-litigation in order to avoid producing the actual, original documents in its database, this document cannot be relied upon as an exhaustive snapshot of all landlord requirements during the relevant period:  it provides a floor, but not a ceiling, of the discriminatory requirements set forth in the MA database.  Nonetheless, this document provides conclusive evidence of discrimination at MA.  No fewer than 70 listings (i.e., apartments that MA closed during the relevant period) expressly state that the landlord prefers or requires employment.  The following are typical of the requirements revealed in the spreadsheet: "WANTS ESTABLISHED WORKING PEOPLE," "MUST BE ESTABLISHED WORKING

---

April 5, 2011 and April 8, 2011; Complaint ¶ 36.)  The recordings made by FHJC testers on April 1, 2011 accurately reflect the conversations that the testers had with Ms. Garcia-Meadows and Ms. Fernandes.  (SF14.)

PERSON," "MUST HAVE GREAT JOB," and "PEOPLE WITH JOBS ONLY."  As discussed in the Argument, <u>infra</u>, such requirements discriminate – whether overtly or by disparate impact – against individuals like Mr. Short who are disabled and whose lawful source of income is a governmental subsidy, not employment.  (PFF ¶ 20.)

The evidence demonstrates that MA has no written policies and procedures regarding housing discrimination; does not provide its brokers and salespersons with any training regarding housing discrimination; and does not require them to attend such training.  After the New York City Council amended the City Human Rights Law to prohibit discrimination based upon lawful source of income, MA did nothing to notify or train its brokers and salespersons regarding the new law.  After the filing of this lawsuit, moreover, MA did not implement any changes in its policies, practices, procedures, or forms to ensure against the housing discrimination at issue here, and did not provide its employees or salespersons with any training on housing discrimination.  (PFF ¶ 21.)

Jerry Weinstein has been the owner of MA for twenty-eight (28) years.  Ninety (90%) percent of MA's business is providing brokering services for the rental of apartments, not sales, with approximately 200-250 apartment closings per month.  For the calendar year 2011, MA earned approximately $5 million in broker's fees.  Currently, MA has roughly 150 licensed associate brokers and sales persons, in addition to administrative staff which includes three employees who work in the MA Listings Department.  (PFF ¶ 22.)

## II.     FACTS RELATING TO DEFENDANT ABBA REALTY ASSOCIATES, INC.

In October 2010, Mr. Short visited Abba Realty Associates, Inc. ("Abba") on Albany Avenue in Brooklyn, New York in search of an apartment.  An individual at Abba asked Mr. Short, "Are you on a program?"  Mr. Short was then directed to Mercedeh "Mercedes" Rofeim,

10

an Abba employee who, he learned, deals virtually exclusively with clients who receive government housing subsidies.  (PFF ¶ 23.)

In early November 2010, on another visit to the Abba offices, Mr. Short noticed in the office window multiple listings for apartments that were both attractive to Mr. Short and within his price range of around $1100.  When Mr. Short asked Ms. Rofeim about the apartments, she informed him that those apartments were not available for "programs."  Mr. Short pointed out that he was already approved by HASA for apartments in the price range of the apartments in question.  Ms. Rofeim responded, "Well, those apartments aren't for program people."  Ms. Rofeim explained to Mr. Short that some landlords with whom Abba worked "don't work with program people."  (PFF ¶ 24.)

When Ms. Rofeim stepped away, Mr. Short decided to ask another Abba employee (SF30), Carmen Peña, about the listings in the window.  In response to Mr. Short's inquiries, Ms. Peña explained to Mr. Short, "Those apartments don't accept HASA.  Some apartments are for HASA people, some are for regular people."  Despite Mr. Short's explicit requests, then, no one at Abba showed Mr. Short any of the listings in the window.  (PFF ¶ 25.)

Mr. Short has credibly testified that Abba operates a segregated system in which some of its apartments are available for individuals "on programs," and some are not.  "I was not given the apartments in the window as an option.  What Mercedes did was steer me.  It was a practice called steering, where you show certain people certain apartments and other people other apartments.  That's called steering."  Mr. Short explained, moreover, that the apartments made available to HASA clients were inferior:

> [T]he only apartments that I was shown by Abba were apartments that were their
> throwaway apartments.  They were subpar apartments, they were not good
> apartments.  And those are the apartments, those are the types of apartments that

they have for people who have HASA as a vendor and who are disabled and homeless.

The tests conducted by FHJC fully corroborated Mr. Short's testimony.  (PFF ¶ 26.)

On January 24, 2011, a female tester employed by FHJC called Abba looking for a one-bedroom apartment for rent up to $1,100 a month.  The tester spoke with Abba agent Yisroel "Israel" Golowinsky, who informed the tester that he had a one-bedroom apartment for $1,100 per month in the Prospect Heights/Crown Heights area (on St. Mark's) in Brooklyn available immediately, with no broker's fee.  He informed the tester that after he ran her credit, if she put a deposit on the apartment to hold it off the market, she could sign a lease "this weekend."  Mr. Golowinsky offered to show the tester an apartment that day and informed her that he would make himself available that evening to show it if the tester wanted to see it immediately.  (PFF ¶ 27.)

Later that same day, the same female tester called Mr. Golowinsky again and told him that she was no longer interested in the apartment, but her disabled brother, a HASA client, might be.  Mr. Golowinsky informed the tester:  "Um, me personally I don't deal with that.  But there is someone in the office who does deal with that."  He then told the tester to call Abba back and ask for Mercedes, adding:  "She's the agent that deals with the HASA program."   (PFF ¶ 28.)

The tester then asked Mr. Golowinsky if the one-bedroom apartment that they discussed would be available to a HASA client.  Mr. Golowinsky responded that he wasn't sure how the HASA program worked, and again suggested that the tester deal with Ms. Rofeim, adding, "she would know all the listings for HASA."  Abba has stipulated that "[o]n January 24, 2011, Mr.

Golowinsky knew of one-bedroom apartments available to rent in the price range of $1100 per month."  (PFF ¶ 29.)

Later that same day, the same female tester called Abba per Mr. Golowinsky's instructions and spoke with Ms. Rofeim.  Ms. Rofeim confirmed Mr. Golowinsky's comment that she was the agent who deals with HASA, and asked the tester, "what do you have?  You have it straight HASA or you have SSI or SSD?"  "I need to know this, because that makes a difference."  She added, "Because certain buildings – he is on disability?"  The tester explained that she was inquiring on behalf of her brother, a HASA client.  (PFF ¶ 30.)

When the tester began to inquire about the one-bedroom apartment on St. Marks (Mr. Golowinsky's listing), Ms. Rofeim interrupted:  "No, I have to, I have to see what, you know, what I have available.  If it's a one-bedroom or not."  "[L]et him come see me.  My name is Mercedes.  And he can bring me all his paperwork.  Meaning the HASA award letter, or the budget letter.  Plus the SSD, the disability budget letter.  I, I need the social security card.  And a photo ID."  Ms. Rofeim later added:  "I'll run his credit.  If everything is good, then I'll tell him what I have available . . . ."  Abba has stipulated that "[o]n January 24, 2011, Abba Realty had one-bedroom apartments available to rent in the price range of $1100 per month."  (PFF ¶ 31.)

Later that same day, the same female tester called Ms. Rofeim again, and again inquired about the one-bedroom apartment on St. Marks Avenue, asking if that landlord would accept HASA.  Ms. Rofeim responded:  "Um, let me find out – I don't know, but, uh, in either case your brother would have to come see me with all the paperwork.  And give him the address.  When he comes to see me, if they do, then, you know, I'll make sure he gets sent."  Ms. Rofeim added, "But I can't do anything until I meet him and until I see all the paperwork."  (PFF ¶ 32.)

The tester then asked, "So, some of the properties you have do take it [HASA], and some don't . . . ?" Ms. Rofeim responded, "Yes. Yes. Yes." Abba has stipulated that the recordings made by FHJC testers on January 24, 2011 accurately reflect the conversations that the testers had with Mr. Golwinsky and Ms. Rofeim.  (PFF ¶ 33.)

On March 31, 2011, a male, non-disabled tester employed by FHJC visited Abba looking for a one-bedroom apartment for rent under $1,200 per month.  The non-disabled, male tester spoke with Mr. Golowinsky, the same Abba agent who spoke to the female FHJC tester in January.  Mr. Golowinsky asked the tester about his credit and income.  The tester responded that his credit was good and that he earned around $41,000 per year from employment.  Mr. Golowinsky stated, "I have a one-bedroom for 1,100."  Mr. Golowinsky explained that the apartment was located on St. Marks and New York Avenue in Brooklyn and was available "right away."  Mr. Golowinsky showed the tester photographs of the apartment, and took the tester to see the apartment on St. Marks without running a credit check or requiring any proof of income. Abba has stipulated that "[o]n March 31, 2011, Mr. Golowinsky knew of one-bedroom apartments available to rent in the price range of $1100 per month."  (PFF ¶ 34.)

That same day, March 31, 2011, a female tester employed by FHJC went to Abba's office and explained that she was inquiring about a one-bedroom apartment for rent she had seen advertised by an Abba agent on Craigslist, on behalf of her son.  The female tester stated that her son was living with HIV, and was with the HASA program, and she was directed to Ms. Rofeim. The female tester then met with Ms. Rofeim and again asked whether the apartment listed on Craigslist for $1,100 was still available, "or are there more like that?"  Ms. Rofeim responded, "I don't think this – they accept program.  This is not for program."  The tester asked, "This particular . . .," whereupon Ms. Rofeim responded, "Yeah.  Talk to me a little bit about your son.

14

This is not in program [*sic*], because I don't have it.  But, talk to me – let me see what I can do for him."  (PFF ¶ 35.)

 In stark contrast to how Mr. Golowinsky treated the employed tester, Ms. Rofeim informed the "program" tester that she had to run the son's credit, and that she could not show him apartments until she confirmed what kind of credit he had.  When the tester explained to Ms. Rofeim that HASA would pay up to $1,150 per month, Ms. Rofeim responded, "Doesn't matter.  Because nowadays the landlords have had so much grief from HASA client [*sic*], that a lot of them don't even want to accept this program."  She added, "But [they're] willing to do it if they see client is good."  (PFF ¶ 36.)

Ms. Rofeim then informed the female tester that the $1,100 apartment listed on Craigslist was not available for the tester's son, since it was not listed among the apartments in Ms. Rofeim's portfolio, i.e., those landlords willing to accept clients receiving a HASA subsidy.  Ms. Rofeim explained, "No.  No.  I don't have it, so this is out."  (<u>Id.</u> line 193.)  She added, "This is probably for working [people].  I'll find out."  (PFF ¶ 37.)

The female tester informed Ms. Rofeim that an "Ava" was listed on the Craigslist advertisement.  Ms. Rofeim responded, "So call Ava.  But I'm telling you, this is not for program [*sic*].  But you can call her, that's the agent."  (PFF ¶ 38.)

A short time later during the same meeting, Ms. Rofeim told the female tester that she wanted to see the tester's disabled son, stating, "And it would be nice if I could physically see him . . . [b]ecause I need to see what he looks like, you know."  Ms. Rofeim never showed the tester the $1,100 apartment advertised on Craigslist.  Abba has stipulated that "[o]n March 31, 2011, Abba Realty had one-bedroom apartments available to rent in the price range of $1100 per month."  Abba has also stipulated that the recordings made by FHJC testers on March 31, 2011

accurately reflect the conversations that the testers had with Mr. Golowinsky and Ms. Rofeim. (PFF ¶ 39.)

Defendant Abba has, in fact, brazenly admitted to participating in a discriminatory scheme, proclaiming that "some of the building owners with whom Abba works do not accept programs."  Abba employee Rofeim has confirmed this fact, admitting to a scheme in which HASA clients are treated differently than other applicants at Abba.  In explaining this disparate treatment, Ms. Rofeim suggested that, "[w]ith HASA people, for whatever reason it is, maybe they not educated [*sic*], like they don't teach them or something, they feel it's their right if they go, destruct the building."  "A lot of them," she added, "when they go to a building and it happens to be a good building, you know, working and program, they make it like a drug building."  (PFF ¶ 40.)

Ms. Rofeim admitted that there are landlords with whom Abba works who do not want to rent to HASA clients.  Some of the properties take HASA clients, but some do not; some of the apartments at Abba are for programs, and some are not; and some of the landlords with whom Abba works want working people, not people on programs.  According to Ms. Rofeim, there are landlords who will rent to a HASA client only if Ms. Rofeim assures them that the client is a good person.  ("I tell the landlord this is a good person, take them, you're not going to have a problem.")  With respect to landlords who do not want HASA clients such as Mr. Short, Ms. Rofeim does not attempt to place the HASA applicants with the landlord, or insist that the landlord not discriminate against the HASA clients; rather, Ms. Rofeim merely tries "to get them something else with a different landlord."  Ms. Rofeim explained, "I can't force any landlords who they choose to want or not."  In sum, Abba collects its brokers' fees by continuing to work with, and facilitates the rental of apartments for, landlords who openly discriminate.  (PFF ¶ 41.)

16

Finally, the evidence demonstrates that Abba did not provide its employees with training about housing discrimination laws; did not provide them with policies and procedures regarding housing discrimination; did not provide them with any training or memoranda after the New York City Council passed the new source of income discrimination law in 2008; and, after this lawsuit was filed, did not provide them with any direction about housing discrimination.  (PFF ¶ 42.)

Sheina Levin is the sole owner of Abba and has held a real estate license as a sales person and then broker for nearly twenty years.  According to Ms. Levin, Abba closes approximately 100 to 150 apartment rentals per year to renters participating in government programs and at least 80% of those closings involve renters with a HASA subsidy.  In 2011, Abba's gross revenue from all rental apartment closings was approximately $650,000 to $700,000, with an additional $100,000 in broker's fees earned from sales.  Currently, Abba has approximately 15 licensed brokers and sales persons working out of two offices, in addition to several employees who assist with the renting of apartments.  (PFF ¶ 43.)

## III.   INJURIES SUSTAINED BY PLAINTIFFS

### A.      Keith Short

Mr. Short seeks compensatory damages for the loss of rights, the humiliation, embarrassment, and emotional distress caused by Defendants' discrimination, about which Mr. Short will offer compelling testimony at trial.  Among other things, Defendants' discrimination caused Mr. Short, a man living with a severely compromised immune system, to remain homeless for several months, and to endure dangerous, substandard emergency housing conditions while he sought to secure a home.  (PFF ¶ 44.)

It is difficult to overstate the importance of stable housing for the health and wellbeing of an individual such as Mr. Short who is living with AIDS.  As a 2005 study commissioned by the New York City Mayor's Office on AIDS Policy Coordination concluded:

Homeless persons with HIV/AIDS face unusual health risks.  They are thought to experience higher rates of morbidity and mortality than domiciled persons with HIV/AIDS, to face greater barriers to health care, and to be less likely to have access to and/or the supports necessary to comply with complex anti-HIV drug regimens.  In New York City, homelessness or unstable housing has been found to be persistently associated with barriers to medical care, lower rates of service utilization, and poor adherence to complex treatment regimens.

(Hudson Planning Group, "An Assessment of the Housing Needs of Persons with HIV/AIDS, New York City Eligible Metropolitan Statistical Area," (New York 2005), at 42-43.) (PFF ¶ 45.)

When Mr. Short approached Defendants for assistance in securing a home, he was indigent, homeless, and living with AIDS, along with other maladies.  At the time, he was residing in emergency housing provided by HASA, enduring conditions that are dangerous and inappropriate for a person living with AIDS:  among other things, he was required to use a dirty, communal bathroom, and to live with roaches and mice.  In addition, he had no access to cooking facilities, making it impossible to cook and, with very limited funds, to purchase the healthful food so essential to fighting his illnesses.  With a housing subsidy from HASA, however, Mr. Short was ready and able to secure a one-bedroom home.  (PFF ¶ 46.)

When Mr. Short approached Defendants, and throughout the period in which Mr. Short remained homeless, Defendants had suitable one-bedroom apartments that Mr. Short could have secured with his HASA subsidy, ending his homelessness.  Indeed, MA has stipulated:  "From

August 2010 through June 2011, Manhattan Apartments had numerous one-bedroom apartments,

and on any given day, dozens of one-bedroom apartments, available to rent in the price range of

$1,100 per month in its listings database."  MA agent Salsberry initially informed Mr. Short that

there were plenty of apartments in Manhattan in Mr. Short's price range, before denying him

access for discriminatory reasons.  MA has stipulated that in both January and April 2001, when

the FHJC tests were conducted, MA had, and its agents were aware of, "one-bedroom apartments

available to rent in the price range of $1100 per month in its listings database."  (PFF ¶ 47.)

Abba similarly had suitable one-bedroom apartments available in Mr. Short's price range

during the period in question, as both the FHJC tests and the Stipulated Facts establish.  (PFF ¶

48.)

Even though Defendants knew of suitable apartments for rent within Mr. Short's price

range, they refused for discriminatory reasons to permit Mr. Short to see or apply for those

apartments.  As a result of this discrimination, Mr. Short remained homeless for many months

until he finally secured a home, through his own efforts, on June 1, 2011.  (Mr. Short's

homelessness was extended from October 2010 until June 1, 2011 in the case of Abba, and from

January 5, 2011 to June 1, 2011 in the case of MA).  In addition, owing to Defendants'

discrimination, throughout this time, Mr. Short was obligated to and did expend considerable

time and effort in his search for a home.  (PFF ¶ 49.)

### B.      Fair Housing Justice Center

In response to Mr. Short's complaints of housing discrimination, FHJC expended staff

time and other resources to obtain information regarding Mr. Short's specific allegations and to

conduct a testing investigation of Defendants and two other realty companies Mr. Short contacted

during his housing search between October 2010 and June 1, 2011.  FHJC testers made phone

calls and in-person visits to each of four real estate offices, including Defendants.  FHJC staff

prepared written assignments forms for each tester, and testers who made in-person visits

completed written report forms.  FHJC staff reviewed the testers' recordings and reports and

prepared a summary of the information obtained by each tester.  The FHJC Board of Directors

met with FHJC staff and legal counsel to determine what steps to take in response to the

information collected by the testers.  All of these activities diverted FHJC staff from spending

time on other activities and caused FHJC to incur the cost of staff time and supplies devoted to

responding to Mr. Short's complaints in the total amount of $9833.00.  (PFF ¶ 50.)

Defendants' discriminatory practices reduce the supply of decent and affordable housing

that is available on an equal basis to persons with disabilities who use government rental

subsidies or vouchers, particularly those individuals living with HIV/AIDS and receiving a

HASA housing subsidy.  Defendants' conduct has frustrated the FHJC's ability to accomplish its

mission to create open, accessible, and inclusive communities by imposing discriminatory

barriers to access to housing for New Yorkers.  Defendants have taken no steps since the filing of

this lawsuit to stop their discriminatory practices.  (PFF ¶ 51.)

To overcome this continuing frustration of mission, it is necessary and appropriate

to require the implementation of anti-discrimination policies and procedures, fair housing

training, compliance monitoring – including future testing of Defendants, and other measures.

(PFF ¶ 52.)

## ARGUMENT

**I.     THE PROVISIONS OF THE FAIR HOUSING ACT ARE TO BE GIVEN A BROAD AND LIBERAL CONSTRUCTION.**

The purpose of the Fair Housing Act ("FHA") is to "provide . . . for fair housing throughout the United States."  42 U.S.C. § 3601.  The provisions of the FHA are to be given broad and liberal construction to carry out a "policy that Congress considered to be of the highest priority."  Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 209, 211 (1972).  The Supreme Court has reaffirmed this construction.  City of Edmonds v. Oxford House, Inc., 514 U.S. 725 (1995); Havens Realty Corp. v. Coleman, 455 U.S. 363, 380 (1982).

**II.     PLAINTIFF FHJC HAS STANDING UNDER THE FAIR HOUSING ACT.**

Organizations such as FHJC have standing to bring claims of discrimination under the FHA where they have sustained a "distinct and palpable injury."  Warth v. Seldin, 422 U.S. 490, 501 (1975).  Such an injury may include situations where a) resources are diverted from other organizational activities to identify and counteract a defendant's discriminatory practices and b) the organization's mission is frustrated by a defendant's discriminatory conduct.  Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982); Nnebe v. Daus, 644 F.3d 147 (2d Cir. 2011); New York Civil Liberties Union v. N.Y. City Transit Authority, 652 F.3d 247 (2d Cir. 2011); Ragin v. Harry Macklowe Real Estate, 6 F.3d 898 (2d Cir. 1993).

Here, FHJC conducted a testing investigation in response to housing discrimination complaints received from Mr. Short regarding Defendants in order to identify Defendants' actual policies and practices.  Following the investigation, FHJC staff evaluated the testing and met with FHJC's Board of Directors to determine how to counteract the discriminatory practices that the organization's testing investigation had revealed.  Additional time was spent by FHJC staff to

meet with legal counsel in preparation to file the Complaint in this action.

Testimony by Catherine Bowman, who has worked with HASA clients searching for decent and affordable rental housing for more than two decades, and from Fred Freiberg, FHJC Executive Director, established that discrimination against HASA renters based on disability and source of income is rampant throughout the City of New York; that this discrimination severely restricts the housing opportunities that are available to HASA clients; and that this often causes such clients to remain homeless for extended periods of time, and to rent unsafe and inadequate housing.

MA is one of the largest rental real estate brokers in New York City, with gross revenues of $5 million a year in rental closings.  (Weinstein Tr. at 30, lines 11-14.)  As such a large broker, its impact on the New York City housing market is substantial.  Thus, its discriminatory practices as detailed below serve to reduce the supply of decent and affordable housing that is available on an equal basis to persons with disabilities who use government rental subsidies such as HASA.

Although Abba is a smaller real estate company than MA, it works regularly with HASA clients and devotes at least one full-time employee to working overwhelmingly with HASA clients in Brooklyn and the Bronx.  Indeed, over half of Abba's business consists of rentals to HASA clients.  (Levin Tr. at 59, lines 21-24.)  Unfortunately, the HASA clients who come to Abba requesting assistance with their housing search are subjected to a segregated system of service, and to onerous pre-conditions that are not required of individuals who are not HASA clients, as described in greater detail below.

Thus, Defendants' discriminatory conduct has caused FHJC to devote resources to identify and counteract the discrimination, and it has frustrated FHJC's ability to accomplish its mission to create open, accessible, and inclusive communities by imposing discriminatory

barriers to access to housing for New Yorkers.  See Fair Housing Justice Center v. Edgewater

Park Owners Cooperative, No. 10-CV-00912, 2012 WL 762323, at *6 (S.D.N.Y. March 9,

2012); Cales v. New Castle Hill Realty, No.10-CV-03426, 2011 WL 335599 (S.D.N.Y. Jan. 31,

2011).

### III.    PLAINTIFFS HAVE AMPLY SUBSTANTIATED THEIR CLAIMS UNDER THE FAIR HOUSING ACT.

As a preliminary matter, Plaintiffs note that (i) under the FHA, defendants are vicariously

liable for the actions, conduct, and statements of their agents; (ii) real estate agencies are liable

for carrying out landlords' discriminatory instructions; (iii) Defendants have stipulated that Keith

Short is a person with a handicap under the FHA and receives a public source of income, and (iv)

it is established that Plaintiffs may proceed under a disparate impact theory of liability under the

FHA, a theory fully applicable to the circumstances at bar.

First, under the FHA, "ordinary tort-related vicarious liability rules apply."  Meyer v.

Holley, 537 U.S. 280, 285-287 (2003).  A principal, thus, is liable for the acts, conduct, and

statements of its agent done within the scope of the agent's apparent authority, including when

the agent is carrying out the discriminatory policies or instructions of a landlord.  Id.  See Cabrera

v. Jakabovitz, 24 F.3d 372, 385-390 (2d Cir. 1994).

Second, real estate agencies are liable for carrying out landlords' discriminatory

instructions.  See Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (landlords, real estate

companies, and individual agents of real estate companies all held liable for racially

discriminatory treatment of testers); Reyes v. Fairfield Properties, 661 F. Supp. 2d 249, 279-80

(E.D.N.Y. 2009) (FHA does not limit liability only to landlords; agents of landlords may be held

liable under FHA).  See also Dillon v. AFBIC Development Corporation, 597 F.2d 556 (5th Cir.

1979) (real estate company held liable for carrying out sellers' instruction not to rent to Black prospective buyer); Jeanty v. McKey, 496 F.2d 1119, 1120-21 (7th Cir. 1974) (real estate agents are liable even where their actions were at the behest of a landlord).

Defendants, through their own employees and agents, have facilitated various landlords' discriminatory policies by 1) filtering prospective tenants based on disability and/or source of income, and 2) collecting broker's fees for rental transactions premised on discriminatory policies and practices.  Accordingly, and as more fully discussed below, MA and Abba should be held liable for violating the FHA.

Third, Defendants MA and Abba have stipulated that Keith Short is a person with a handicap for the purposes of the FHA.  (SF 1.)  Because he is indigent and living with AIDS, Mr. Short qualified for a HASA rental subsidy, which he could use to rent an apartment in New York City.  (SF2, 4, 5.)  A person is only eligible for a HASA rental subsidy if, among other criteria, s/he is a person living with clinical/symptomatic HIV illness, or AIDS.  (Complaint ¶ 21.)  All persons who are eligible for a HASA rental subsidy (100%) are persons with a handicap as defined by the Fair Housing Act.  42 U.S.C. § 3602(h); (see SF3.)  Mr. Short is disabled and unemployed, living not merely with HIV illness but with AIDS and other maladies.  His only source of income for rent is a HASA housing subsidy.

Fourth, for their claims under the Fair Housing Act, except their Section 3604(c) claim against Abba, Plaintiffs rely upon disparate impact analysis to establish their claims of disability-related discrimination.  Under a disparate impact analysis, Plaintiffs need not demonstrate discriminatory intent.  See, e.g., Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934 (2d Cir. 1988) (under disparate impact analysis:  "The plaintiff need not show that the decision complained of was made with discriminatory intent.") (citations omitted).  Rather,

Plaintiffs must show:  (1) the occurrence of certain outwardly neutral practices of Defendants, and (2) a significantly adverse or disproportionate impact on disabled individuals produced by Defendants' facially neutral acts or practices.  Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003).  Defendants must then present a bona-fide and legitimate justification for their policies, with no less discriminatory alternatives available.  Huntington, 844 F.2d at 939. Common sense dictates that Defendants may not rely upon the discriminatory directives of landlords as a legitimate justification for their business policies and practices.

Here, Plaintiffs have demonstrated outwardly neutral practices that have a significantly adverse and disproportionate impact on disabled individuals.  In the case of MA, its regular practice is to require that applicants be gainfully employed, and to refuse to assist individuals with a HASA housing subsidy.  For Abba, the challenged neutral practice is a segregated system for providing real estate brokering services that excludes renters with HASA from access to all the company's rental listings.

In New York City, HASA provides Mr. Short and other similarly situated disabled individuals with a housing subsidy precisely because they are disabled and unemployed.  A requirement of gainful employment, such as MA utilizes, not only adversely impacts Mr. Short and other similarly disabled individuals, but – because they are disabled and unemployed – it categorically prevents them from securing any housing through MA, one of the largest rental brokers in New York City.  Similarly, MA's refusal to assist individuals with HASA, a government housing subsidy only for persons with disabilities, adversely impacts and disproportionately impacts disabled individuals living with HIV/AIDS, who comprise 100% of HASA recipients.

Abba has adopted a filtered and segregated mechanism for discriminating against renters

living with AIDS who have a HASA housing subsidy.  Instead of refusing to provide any service

or assistance to such renters, Abba has created a segregated system that only provides renters

with a HASA housing subsidy, all of whom are living with AIDS, with access to a limited

number of rental units, instead of all of Abba's listings within the price range that is affordable to

HASA recipients.

Neither MA nor Abba has identified any legitimate, non-discriminatory reason for the

policies at issue in this case, let alone addressed the issue of alternative policies with a less

disparate impact.

With these principles in mind, we turn to Plaintiffs' specific claims under the FHA.

A.      **Fair Housing Act, 42 U.S.C. § 3604(f)(1).**

The FHA provides that it is illegal:  "To discriminate in the sale or rental, or to otherwise

make unavailable or deny, a dwelling to any buyer or renter" because of disability.  42 U.S.C. §

3604(f)(1).  Defendants illegally discriminated against Plaintiffs by otherwise making

unavailable apartments for rent because of disability, including, but not limited to, a) refusing to

provide information about apartments available for rent; b) refusing to show apartments available

for rent; and/or c) failing to provide applications and information about the application process

for apartments available for rent.  Since the conduct at issue in this case occurred prior to either

Mr. Short's or any of the FHJC testers' submitting a rental application for a specific apartment to

rent, the Court need not address the question whether Mr. Short or the testers was/were

"qualified" to rent the apartments they inquired about, or whether they made a "bona fide offer."

It is well settled that the FHA's prohibition against "otherwise making unavailable" apartments

for rent is not dependent on a finding that the person inquiring about housing be "qualified" or

make a "bona fide offer."  See Grant v. Smith, 574 F.2d 252, 255 (5th Cir. 1978); U.S. v.

Youritan Construction Co. 370 F. Supp. 643, 650 (N.D. Cal. 1973), aff'd in part, remanded in part on other grounds, 509 F.2d 623 (9th Cir. 1975); Johnson v. Jerry Pals Real Estate, 485 F.2d 528 (7th Cir. 1973); See also Havens, 455 U.S. 363, at 373-74; Wheatley Heights Neighborhood Coalition v. Jenna Resales Co., 429 F. Supp. 486, 488 (E.D.N.Y. 1977).

      **1.**      **MA**

      The evidence, detailed in the recitation of facts above, is clear that MA consistently and repeatedly implemented a requirement for gainful employment, and routinely and repeatedly refused to assist individuals with a HASA housing subsidy.  To highlight but a few examples, MA agent Robert Salsberry informed Mr. Short that "the landlords do not want any program people, only working people."  (See PFF, supra ¶ 8.)  When Mr. Short asked Mr. Salsberry which landlords in particular felt this way, Mr. Salsberry responded, "all of them, 100%."  (Id.)  Mr. Salsberry later informed an FHJC tester posing as a person with a family member with a HASA rental subsidy:  "At the time right now I don't have any, um, I don't have any um landlords that accept the vouchers right now."  . . . "We [deal] with most of the major landlords and they don't really accept those."  (Id. ¶ 10.)  MA agent Juanita Garcia-Meadows informed an FHJC tester also posing as a person with a family member with a HASA rental subsidy that none of MA's landlords would accept an applicant with HASA.  (Id. ¶¶ 12-13.)  MA assisted FHJC testers who were ostensibly employed and failed or refused to assist testers inquiring on behalf of disabled applicants with a specific type of government assistance, namely a HASA housing subsidy.  (Id. ¶¶ 9-10, 12-13, and 15-16.)  In fact, Ms. Garcia-Meadows informed the tester that some of MA's landlord-clients "do take section 8."  (Id. ¶ 13.)  She then informed a tester, however, that none of MA's landlord-clients would rent to HASA clients.  (Id.)

Within the subset of apartments closed by MA, as opposed to its full inventory of rental listings at any given time, no fewer than 70 listings in the relevant time period <u>expressly</u> stated that the landlord preferred or required employment:  "WANTS ESTABLISHED WORKING PEOPLE," "MUST BE ESTABLISHED WORKING PERSON," "MUST HAVE GREAT JOB," and "PEOPLE WITH JOBS ONLY."  (<u>Id.</u> ¶ 20.)  During the period July 1, 2010 through June 30, 2011, moreover, MA's rental listing database included directives to MA from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords. (<u>Id.</u> ¶ 18.)  MA's owner and agents confirmed MA's systemic discrimination against applicants on programs.  (<u>Id.</u> ¶¶ 11, 14, and 17.)

Thus, by applying these seemingly neutral policies and practices, MA has discriminated against Plaintiffs in the rental of a dwelling and has otherwise made dwellings unavailable because of disability.  42 U.S.C. § 3604(f)(1).

### 2.   Abba

By contrast, Abba did not categorically refuse to assist renters with disabilities, and indeed utilized at least one employee to work virtually exclusively with clients of HASA.  The evidence is clear, however, that Abba utilized a segregated system in which some of its listings were made available to HASA clients such as Mr. Short and other listings were not.  In fact, Abba admitted in its Answer that "some of the building owners with whom Abba works do not accept programs."  (<u>Id.</u> ¶ 40.)

Abba employee Mercedeh Rofeim admitted that there are landlords with whom Abba works who do not want to rent specifically to HASA clients.  Some of the properties take HASA

clients, but some do not; some of the apartments listed with Abba are available for HASA

renters, and some are not.  (Id. ¶ 41.)

Mr. Short's experiences with Abba and those of the FHJC testers evidence this fact.

When Mr. Short inquired about suitable listings advertised in Abba's window, two different

Abba employees informed him that those listings were not available for individuals with a HASA

subsidy.  (Id. ¶¶ 24-25.)  Abba employee Mercedeh Rofeim repeatedly confirmed to FHJC testers

that some of the landlords with whom Abba works accept HASA clients and some do not.  (Id. ¶¶

32, 33, 35-37.)  She also confirmed that she could not and would not offer a disabled HASA

applicant an apartment intended for working people, and that such a listing would not be in her

portfolio of apartments available to such applicants.  (Id. ¶¶ 35, 37-38.)   With regard to one

apartment advertised by Abba on Craigslist, for example, Ms. Rofeim explained:  "I don't have

it, so this is out."  She added, "This is probably for working [people].  I'll find out." (Id. ¶ 37.)

In short, Abba employees and agents refused to show or provide information to Mr. Short

and FHJC testers about apartments that Abba advertised publicly for rent on the internet and/or

posted in windows at the front of the Abba office because they were using a HASA housing

subsidy, a form of rental assistance that is only available to disabled individuals.

Thus**,** by applying these seemingly neutral policies and practices, Abba has discriminated

against Plaintiffs in the rental of a dwelling and has otherwise made dwellings unavailable

because of disability.  42 U.S.C. § 3604(f)(1).

## B.      Fair Housing Act, 42 U.S.C. § 3604(d)

The FHA provides that it is illegal:  "To represent to any person . . . that any dwelling is

not available for inspection, sale, or rental when such dwelling is in fact so available" because of

disability.  42 U.S.C. § 3604(d).  This provision includes "limiting information, by word or

conduct, regarding suitably priced dwellings available for inspection, sale or rental" because of

disability.  28 C.F.R. § 100.80(b)(4).  Defendants violated this provision by limiting the

information they provided to the Plaintiffs because of disability about suitably priced apartments

that were in fact available for inspection and rental.

Section 3604(d) confers on all persons a "legal right to truthful information about

available housing."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 373 (1982).  To prevail

under this Section, an actual homeseeker like Mr. Short, or testers sent by an organization like

FHJC, must show that (a) they are disabled or purporting to request housing on behalf of

someone who is disabled; (b) they requested information on the availability of a particular type of

apartment; (c) defendants failed or refused to provide truthful information as to the availability of

such apartments; and (d) nondisabled prospective applicants or testers were provided with

truthful information.  Fair Housing Justice Center v. Broadway Crescent Realty, No. 10-CV-

00034, 2011 WL 856095 (S.D.N.Y. March 9, 2011); Open Housing Center v. Kessler Realty,

No. 96-CV-06234, 2001 WL 1328446 (E.D.N.Y. Sept. 18, 2001); Cabrera v. Jakabovitz, 24 F.3d

372, 383 (2d Cir. 1994).

One of the accepted tools for proving that a defendant has limited the information it

provided or misrepresented the availability of apartments to show or rent in violation of the FHA

is the well-established practice of testing.   See U.S. v. Space Hunters, Inc., 429 F.3d 416, 420-22

(2d Cir. 2005); Cabrera v. Jakabovitz, 24 F.3d 372, 383 (2d Cir. 1994); Northside Realty

Associates, Inc. v. U.S., 605 F.2d 1348, 1355 (5th Cir. 1979); Smith v. Anchor Building Corp.

536, F.2d 231, 234 (8th Cir. 1978); Wharton v. Knefel, 562 F.2d 550, 554 (8th Cir. 1977); Zuch v.

Hussey, 394 F. Supp. 1028, 1051 (E.D.Mich. 1975), afff'd and remanded, 547 F. 2d 1168 (6th

Cir. 1977); U.S. v. Youritan Construction Co., 370 F. Supp. 643, 650 (N.D. Cal. 1973), aff'd in

part, remanded in part, 509 F.2d 623 (9th Cir. 1975); Fair Housing Justice Center v. Edgewater

Park Owners Cooperative, No. 10-CV-00912, 2012 WL 762323, at *6 (S.D.N.Y. March 9,

2012); Fair Housing Justice Center v. Broadway Crescent Realty, No. 10-CV-00034, 2011 WL

856095 (S.D.N.Y. March 9, 2011); Cales v. New Castle Hill Realty, No.10-CV-03426, 2011 WL

335599 (S.D.N.Y. Jan. 31, 2011).

In the context of testing a real estate company, testers are typically assigned different

socio-economic characteristics and pose as prospective renters who request similar housing from

the same realty firm.  Id.  Evidence resulting from such testing has been the crucial element of

proof in many if not most housing discrimination cases.  See U.S. v. Space Hunters, Inc., 429

F.3d 416, 420-22 (2d Cir. 2005); Cabrera v. Jakabovitz, 24 F.3d 372, 377-79 (2d Cir. 1994).

Testing can provide corroborative circumstantial evidence that an actual homeseeker has suffered

discrimination, and may even reveal direct evidence of discrimination.  Id.

Here, the FHJC conducted telephone tests and in-person tests of employees or agents

working for each of the Defendant real estate companies.  During the telephone tests, the tester

first stated that she was employed, obtaining information about apartments available for rent.

The same tester then telephoned the same agent and inquired about the availability of apartments

for a family member with a HASA housing subsidy.  At some later time, FHJC sent testers to

Defendants' offices to inquire about the same apartment size and price as Mr. Short had

previously requested.  In each instance, one tester posed as an employed person with no

disabilities and the other tester posed as the family member of a person living with AIDS and

using a HASA housing subsidy.  (For MA, see PFF, supra ¶¶ 9-16; for Abba, see PFF, supra ¶¶

27-39.)

The testing in this case fully corroborates Mr. Short's allegations and establishes that both

MA and Abba had a regular practice of discriminating in violation of Section 3604(d) of the FHA by limiting the information it provided and misrepresenting the availability of apartments to show and to rent because of disability.

### C.    Fair Housing Act, 42 U.S.C. § 3604(f)(2)

The FHA provides that it is illegal:  "To discriminate against *any person* in the terms, conditions, or privileges of sale or rental of a dwelling" because of disability.  42 U.S.C. § 3604(f)(2) (emphasis added).   Defendants illegally discriminated against Plaintiffs by discriminating in the terms and conditions of renting apartments because of disability, including, but not limited to, imposing rental conditions that require employment and/or no HASA housing subsidy as a condition for access to information about Defendants' rental listings.  Abba illegally discriminated against Plaintiffs, moreover, by:  a) maintaining segregated apartment listings; and/or b) requiring persons with disabilities to fulfill various requirements as a precondition to being told about available apartments for rent, requirements not imposed upon non-disabled working individuals, including:  requiring HASA clients, such as Mr. Short, to complete an application, pass a credit check, and personally visit the Abba offices before informing them of or showing them available apartments for rent.  (See infra ¶¶ 109-111.)

Thus, by applying these seemingly neutral policies and pre-conditions to HASA clients, including Mr. Short, and not to employed and nondisabled prospective applicants, Abba has discriminated against Plaintiffs in the terms and conditions of rental of a dwelling because of disability.  42 U.S.C. § 3604(f)(2).

**D.      Fair Housing Act, 42 U.S.C. § 3604(c) – as to Abba Only[3]**

The FHA provides that it is illegal:  "To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).

Plaintiffs allege that Defendant Abba violated this provision when its employees made the following statements:

a) Ms. Peña's statement to Mr. Short:  "Those apartments don't accept HASA.  Some apartments are for HASA people, some are for regular people."  (See PFF, supra ¶ 25.)

b) Ms. Rofeim's statement in response to the question of an FHJC tester:   "So, some of the properties you have do take it [HASA], and some don't . . . ?"  Ms. Rofeim responded, "Yes. Yes. Yes."  (See PFF, supra ¶ 33.)

c) Ms. Rofeim's statement to an FHJC tester:   "Because nowadays the landlords have had so much grief from HASA client [sic], that a lot of them don't even want to accept this program."  . . . "But [they're] willing to do it if they see client is good."  (See PFF, supra ¶ 36.)

d) Ms. Rofeim's statement to an FHJC tester:   "This is probably for working [people].  I'll find out."  (See PFF, supra ¶ 37.)

There is no doubt that Abba's employees made the statements set forth in subsections (b), (c), and (d) above, because those conversations were recorded, and Abba has stipulated to the authenticity of the recordings.

---

[3]  Plaintiffs are no longer pursing their claims pursuant to Section 3604(c) of the Fair Housing Act against Defendant Manhattan Apartments.

The statements made to the FHJC testers fully corroborate Mr. Short's testimony regarding similar statements that Abba employees made to him.  If that were not enough, the testimony of Abba employees Rofeim and Peña, detailed in the Statement of Facts, further substantiates Mr. Short's claims.  Mr. Short has amply met his burden to prove by a preponderance of the evidence that these discriminatory statements were also made to him.

By making oral statements to Plaintiffs with respect to the rental of dwellings that indicated preferences, limitations, and/or discrimination, and an intention to make such preference, limitation, and/or discrimination, based on disability, Abba has violated 42 U.S.C. § 3604(c) of the Fair Housing Act.

## IV.     UNDER THE RESTORATION ACT OF 2005, THE CITY HUMAN RIGHTS LAW EXPRESSLY REQUIRES AN INDEPENDENT ANALYSIS AND LIBERAL CONSTRUCTION IN ALL CIRCUMSTANCES, EVEN WHERE STATE AND FEDERAL HUMAN RIGHTS LAWS HAVE COMPARABLE LANGUAGE.

In interpreting Plaintiffs' claims under the City Human Rights Law, the Court must be guided by important and relevant amendments made in 2005.  In that year, in the face of what it perceived as a judicial erosion of civil and human rights protections, the New York City Council passed the Restoration Act[4] explicitly amending the New York City Human Rights Law to require an independent construction of that law, and indeed the most liberal interpretation available:

> The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

N.Y. City Admin. Code § 8-130.

---

[4]  Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, at § 1 (2005) ("It is the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law.").

As the New York Court of Appeals recently explained, in interpreting the City Human Rights Code, "we must be guided by the [Restoration Act], enacted by the City Council to clarify the scope of New York City's Human Rights Law, which, the Council found has been construed too narrowly to ensure the protection of the civil rights of all persons covered by the law." Albunio v. City of New York, 16 N.Y.3d 472, 477 (2011) (citation and internal quotations omitted). Accord id. at 477-78 ("We must construe [this section], like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."); Bumpus v. New York City Transit Auth., 18 Misc. 3d 1131A, 859 N.Y.S.2d 893 (Sup. Ct., Kings County 2008), aff'd 66 A.D.3d 26, 883 N.Y.S.2d 99 (2d Dep't 2009) ("The New York City Human Rights Law sets forth a broad purpose.  The legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation.") (citations omitted); Jordan v. Bates Advertising Holdings, Inc., 11 Misc. 3d 764, 770, 816 N.Y.S.2d 310, 317 (Sup. Ct., N.Y. County 2006) ("The Administrative Code's legislative history clearly contemplates that the New York City Human Rights Law be liberally and independently construed with the aim of making it the most progressive in the nation.").

Of equal importance, the City Human Rights Law must be construed independently, and even more liberally than federal statutes such as the Fair Housing Act:

> [T]he City HRL now explicitly requires an independent liberal construction in all circumstances, even where State and federal civil rights laws have comparable language.  The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart State or federal civil rights laws.

Williams v. New York City Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009).  Accord Nelson v. HSBC Bank USA, 87 A.D.3d at 996, 929 N.Y.S.2d at 261; Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).

Accordingly, the New York City Council expressly provided that "similarly worded provisions of federal and state civil rights laws [are] a floor below which the City Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise."  Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005).  Accord Nelson, 87 A.D.3d at 996, 929 N.Y.S.2d at 261.  See Vig v. New York Hairspray Co., 885 N.Y.S.2d 74, 78 n.6 (1st Dep't 2009); Loeffler, 582 F. 3d at 278.

Finally, under the City Human Rights Law, a principal's liability for the discriminatory conduct of an employee or agent is subject to a strict liability standard in housing discrimination cases.  N. Y. City Admin. Code § 8-107(13)(a).  Where a defendant's liability has been established based solely on the conduct of an employee or agent, the defendant should be permitted to present evidence that prior to the underlying discriminatory conduct, it had:

(1) Established and complied with policies, programs and procedures for the prevention and detection of unlawful discriminatory practices by its employees and agents, including but not limited to:

(i) A meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, agents….and for taking appropriate action against those persons who are found to have engaged in such practices;

(ii) A firm policy against such practices which is effectively communicated to employees, agents…;

(iii) A program to educate employees and agents about unlawful discriminatory practices under local, state and federal law; and

(iv) Procedures for the supervision of employees and agents….specifically directed at the prevention and detection of such practices

N.Y. City Admin. Code § 8-107(13)(d).  Since neither of the Defendants in this case established

or implemented any such policies or programs, the Court should not consider any mitigation of

punitive damages that may be imposed under the City HRL.  N. Y. City Admin. Code § 8-

107(13)(e).  With these principles in mind, we turn to Plaintiffs' City Human Rights Law claims.

**V.      PLAINTIFFS HAVE AMPLY SUBSTANTIATED THEIR CLAIMS UNDER THE CITY HUMAN RIGHTS LAW.**

**A.      City Human Rights Law: Disability Discrimination, § 8-107(5)(c).**

Section 8-107(5)(c) of the New York City Administrative Code provides that it shall be

"an unlawful discriminatory practice for any real estate broker, real estate salesperson or

employee or agent thereof:  (1) To refuse to sell, rent or lease any housing accommodation, land

or commercial space or an interest therein to any person or group of persons or to refuse to

negotiate for the sale, rental or lease, of any housing accommodation, land or commercial space

or an interest therein to any person or group of persons because of the actual or perceived . . .

disability . . . of such person or persons, . . . or otherwise to deny or withhold any housing

accommodation, land or commercial space or an interest therein or any facilities of any housing

accommodation, land or commercial space or an interest therein from any person or group of

persons because of the actual or perceived . . . disability . . . of such person or persons . . . ."

N.Y. City Admin. Code § 8-107(5)(c).

The facts described above establish Defendants' violation of analogous provisions of the

FHA, which similarly prohibit discrimination in the rental of any housing accommodation on the

basis of disability.  Like the FHA, under the City Human Rights Law a plaintiff may prove a

claim of discrimination based on a disparate impact theory of liability.  See, e.g., Levin v.

Yeshiva University, et al., 96 N.Y.2d 484, 489 (2001) ("The City's Human Rights Law goes the

additional step of prohibiting policies or practices which, though neutral on their face and neutral

in intent, have an unjustified disparate impact upon one or more of the covered groups.").  As

discussed, under the Restoration Act, a finding of discrimination under analogous federal statutes

and law constitutes "a floor below which the City Human Rights Law cannot fall, rather than a

ceiling above which the local law cannot rise."  Local Civil Rights Restoration Act of 2005,

N.Y.C. Local Law No. 85 (2005).  In addition, in order to achieve "the uniquely broad and

remedial purposes" of the City Human Rights Law, N.Y. City Admin. Code § 8-130, this Court

is compelled to construe the applicable City Human Rights Law "broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably possible."  Albunio

v. City of New York, 16 N.Y.3d 472, 477-78 (2011).  For the reasons set forth above, this Court

therefore concludes that Defendants MA and Abba violated Section 8-107(5)(c) by (a) refusing to

rent or negotiate for the rental of housing accommodations to Plaintiffs; and (b) otherwise

denying or withholding housing accommodations from Plaintiffs because of disability.

      **B.**     **City Human Rights Law: Lawful Source of Income Discrimination,
§ 8-107(5)(c).**

Section 8-107(5)(c) of the New York City Administrative Code provides that it shall be

"an unlawful discriminatory practice for any real estate broker, real estate salesperson or

employee or agent thereof:  (1) To refuse to negotiate for the sale, rental or lease, of any housing

accommodation . . . because of . . . any lawful source of income of such person . . . or otherwise

to deny or withhold any housing accommodation . . . or an interest therein . . . because of any

lawful source of income of such person . . . (2) . . . to make any record or inquiry in connection

with the prospective purchase, rental or lease of any housing accommodation, land or

commercial space or an interest therein which expresses, directly or indirectly, any limitation,

specification or discrimination as to . . . <u>any lawful source of income</u> . . . ." N. Y. City Admin.

Code § 8-107(5)(c) (emphasis added) (hereinafter the "source of income law").

### 1.   MA

The evidence establishes that MA willfully and systematically violated the City's source

of income law.  When Mr. Short visited MA in search of a home, MA agent Robert Salsberry

perfunctorily informed him that "the landlords do not want any program people, only working

people."  When Mr. Short asked Mr. Salsberry which landlords in particular felt this way, Mr.

Salsberry responded, "all of them, 100%," whereupon Mr. Short left without obtaining any

assistance.  (PFF ¶ 8.)

The tests conducted by FHJC corroborated Mr. Short's testimony, and revealed

widespread and willful discrimination at MA.  MA offered applicants with jobs – i.e., those not

receiving a government subsidy from HASA – full assistance.  In stark contrast, MA repeatedly

and <u>categorically</u> denied service to testers who stated they had a family member receiving a

HASA subsidy.  (<u>Id.</u> ¶¶ 9, 10, 12-16.)

MA agent Salsberry informed one tester:  "[A]t the time right now I don't have any um, I

don't have any um, landlords that accept, uh, the vouchers right now."  (<u>Id.</u> ¶ 10.)  "[W]e

(inaudible) deal with most of the major landlords and they don't really accept those.  Most of the

smaller ones do."  (<u>Id.</u>)  Mr. Salsberry has admitted that it was his understanding that MA could

not assist prospective applicants receiving government subsidies; that he did not know of any

landlords with whom MA worked who would accept applications from renters with a HASA

subsidy; and that, accordingly, he repeatedly declined to assist such clients.  (<u>Id.</u> ¶ 11.)

MA agent Garcia-Meadows confirmed this sweeping discrimination, telling one tester,

*inter alia*, "right now, we don't have [any landlords who rent to HASA clients]."  (<u>Id.</u> ¶ 13.)

When the tester inquired whether Ms. Garcia-Meadows meant in the area in question or in general, Ms. Garcia-Meadows responded, "In general." (Id.)  She also admitted, *inter alia*, that none of the apartments in MA's database were available to prospective applicants receiving government subsidies, and that MA turned away prospective renters with a governmental subsidy because there were no landlords at the time willing to work with government programs. (Id. ¶ 14.)  MA has stipulated that at the time, it had one-bedroom apartments available to rent in the size and price range sought by Mr. Short and the FHJC testers. (Id.)

MA owner Jerry Weinstein also confirmed MA's regular practice of discrimination by admitting that MA continues to work with landlords who discriminate against applicants on government programs and to rent those apartments to other tenants (i.e., those not receiving a governmental housing subsidy), and that he has never informed such landlords that their refusal is illegal or that MA will not work with such landlords.  Mr. Weinstein further admitted that he has never instructed anyone at MA to do so.  In fact, Mr. Weinstein personally carries out the discriminatory instructions of landlords working with MA:  when informed by his Rental Director that there are landlords who refuse to take programs, he tells her to do "Nothing" about it, merely to try to find another landlord who will work with the prospective applicant. (Id. ¶ 17.)

It is apparent, in fact, that MA, at the behest of its landlord clients, routinely discriminates against applicants whose lawful source of income is a government subsidy:  During the period July 1, 2010 through June 30, 2011, MA's rental listing database included directives to MA from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords. (Id. ¶ 18.)

Finally, an MA spreadsheet reveals no fewer than 70 listings of apartments that MA closed during the relevant period that <u>expressly</u> excluded applicants such as Mr. Short with a government subsidy rather than employment as a source of income, including the following: "WANTS ESTABLISHED WORKING PEOPLE," "MUST BE ESTABLISHED WORKING PERSON," "MUST HAVE GREAT JOB," and "PEOPLE WITH JOBS ONLY."  (<u>Id.</u> ¶ 20.)

We will never know the full extent of MA's open and systematic flouting of the City Human Rights Law because MA has refused, despite four court orders, to produce MA's complete listings database, which would reveal all of the apartments with restrictive rental criteria based on source of income being handled by MA agents.

### 2.    Abba

The evidence reveals that Abba, in cooperation with various landlord clients, has also willfully and systematically violated the source of income law.  Unlike MA, Abba does not absolutely refuse to assist clients with a subsidy from HASA.  Indeed, because it is a source of revenue for Abba, Abba has dedicated at least one employee to work virtually full-time with prospective applicants participating in government programs such as HASA.  Unfortunately, however, Abba discriminates against such applicants by employing a scheme of segregated listings, in which some of the properties in its portfolio are made available to HASA applicants and some are not.  In addition, Abba has violated the source of income law by using a form of application for rentals and/or by making inquiries of Plaintiffs in connection with rentals that express – directly or indirectly – a limitation, specification, or discrimination based on lawful source of income.

Abba has in fact admitted to participating in a discriminatory scheme, confirming that "some of the building owners with whom Abba works do not accept programs."  (PFF, <u>supra</u> ¶

40.)  Mr. Short learned of this scheme when he turned to Abba for assistance in securing an apartment.  When Mr. Short asked Abba employee Mercedeh Rofeim about office window listings that were both attractive to Mr. Short and within his price range, she informed him that those apartments were not available for "programs."  Mr. Short pointed out that he was already approved by HASA for apartments in the price range of the apartments in question.  Ms. Rofeim responded, "Well, those apartments aren't for program people."  Ms. Rofeim explained to Mr. Short that some landlords with whom Abba worked "don't work with program people," a fact that another Abba employee confirmed.  (Id. ¶¶ 24-25.)

Mr. Short has credibly testified that Abba operates a segregated system in which some of its apartments are available for individuals "on programs," and some are not.  (Id. ¶ 26.)  Mr. Short explained, moreover, that the apartments made available to HASA clients were inferior.  (Id.)  The tests conducted by FHJC corroborated Mr. Short's testimony.  Applicants with jobs – i.e., not receiving a government subsidy from HASA – received full assistance from Abba agents without limitation.  Abba told them of available apartments without requiring them to come in to the office, and Abba showed them photographs of such apartments, and even showed those apartments, without requiring them to fill out an application or to pass a credit check.  (Id. ¶¶ 27, 34.)

By contrast, Abba requires applicants receiving a housing subsidy to complete an application, to pass a credit check, and to meet Ms. Rofeim's approval in-person before being told of available apartments:  "I'll run his credit.  If everything is good, then I'll tell him what I have available . . . ."  (Id. ¶ 31; see id. ¶¶ 28, 29, 31, 32, 36, 39, 41.)  "[Y]our brother would have to come see me with all the paperwork," she informed the tester inquiring on behalf of a HASA client.  "I can't do anything until I meet him and until I see all the paperwork."  (Id. ¶ 32.)  Ms.

42

Rofeim even asked to see what the HASA client looked like before assisting him:  "And it would be nice if I could physically see him . . . [b]ecause I need to see what he looks like, you know."  (Id. ¶ 39.)

This is consonant with her practice of assessing whether a HASA client is a "good person" before deciding whether to convince a landlord to accept the client (id. ¶ 41), a practice that Abba does not impose upon employed applicants.  Indeed, in stark contrast, Abba agent Golowinsky told an employed applicant about an available apartment sight unseen, even informing the tester over the phone that if she put down a deposit, after a credit check, the apartment could be hers "this weekend."  (Id. ¶ 27.)

The audio recordings made by FHJC testers are indeed replete with evidence of blatant and systematic source of income discrimination at Abba.  Among other things, when an FHJC tester asked Ms. Rofeim, "So, some of the properties you have do take it [HASA], and some don't . . . ?," Ms. Rofeim responded, "Yes. Yes. Yes."  (Id. ¶ 33.)   "This is not for program," Ms. Rofeim explained to another tester, on another occasion.  (Id. ¶ 35.)  "This is not in program [sic], because I don't have it.  (Id.)  And again:  "I don't have it, so this is out."  (Id. ¶ 37.)  She added, "This is probably for working [people].  I'll find out."  (Id.)

In her testimony, moreover, Ms. Rofeim admitted to this discriminatory scheme, explaining, inter alia, that some of the apartments at Abba are for programs, and some are not.  (Id. ¶ 41.)  With respect to landlords who do not want HASA clients such as Mr. Short, Ms. Rofeim admitted that she does not attempt to place the HASA applicants with the landlord, or insist that the landlord not discriminate against the HASA clients; rather, Ms. Rofeim merely tries "to get them something else with a different landlord."  (Id.)  In other words, Abba is a willing and willful participant in a blatantly discriminatory scheme in which landlords are

permitted to direct Abba not to rent to HASA clients, and Abba implements these discriminatory directives.

## VI.    PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES.

Actual damages, including non-economic compensatory damages for lost housing opportunity and emotional distress caused by a defendant's discriminatory conduct, are recoverable under the FHA and the City Human Rights Law.  42 U.S.C. § 3613(c)(1); 24 C.F.R. § 180.670(b)(3)(i); N. Y. City Admin. Code § 8-502(a).  Intangible damages for emotional distress, embarrassment, and humiliation may be inferred from the circumstances and established by a plaintiff's own testimony.  See Broome v. Biondi, 17 F. Supp. 2d 211, 223–26 (S.D.N.Y. 1997); Portee v. Hastava, 853 F. Supp. 597, 609, 612-16 (E.D.N.Y. 1994) on reconsideration, (June 14, 1994), judgment aff'd. 104 F.3d 346 (2d Cir. 1996); Seaton v. Sky Realty Co. Inc., 491 F.2d 634 (7th Cir. 1974).

Mr. Short seeks compensatory damages for the loss of rights, the humiliation, embarrassment, and emotional distress caused by Defendants' discrimination.  Among other things, Defendants' discrimination caused Mr. Short, a man living with a severely compromised immune system, to remain homeless for several months, and to endure dangerous, substandard emergency housing conditions while he sought to secure a home.  (PFF ¶ 44.)

When Mr. Short approached Defendants for assistance in securing a home, he was indigent, homeless, and living with AIDS, along with other maladies.  At the time, he was residing in emergency housing provided by HASA, enduring conditions that are dangerous and inappropriate for a person living with AIDS:  among other things, he was required to use a dirty, communal bathroom, and to live with roaches and mice.  In addition, he had no access to cooking

facilities, making it impossible to cook and, with very limited funds, to purchase the healthful

food so essential to fighting his illnesses.  (PFF ¶ 46.)

As a result of Defendants' discrimination, Mr. Short remained homeless for many months

until he finally secured a home, through his own efforts, on June 1, 2011.  (Mr. Short's

homelessness was extended from October 2010 until June 1, 2011 in the case of Abba, and from

January 5, 2011 to June 1, 2011 in the case of MA).  In addition, owing to Defendants'

discrimination, throughout this time, Mr. Short was obligated to and did expend considerable

time and effort in his search for a home.  (PFF ¶ 49.)

FHJC seeks compensatory damages for the cost of staff time and other resources it

expended to 1) respond to Mr. Short's housing discrimination complaints, 2) conduct a testing

investigation to identify Defendants' discriminatory policies and conduct; 3) evaluate the

information it obtained; and 4) decide how to counteract Defendants' practices.   All of these

activities diverted FHJC staff from spending time on other activities and caused FHJC to incur

the cost of staff time and supplies devoted to responding to Mr. Short's complaints in the total

amount of $9,833.00.  (PFF ¶ 50.)

## VII.   PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES.

Both the FHA and the City Human Rights Law expressly provide for an award of punitive

damages under the circumstances of this case.  42 U.S.C. § 3613(c)(1); N. Y. City Admin. Code

§ 8-502(a).  Punitive damages are intended to punish wrongdoers and to deter them and others

like them from similar conduct in the future.  Smith v. Wade, 461 U.S. 30, 54 (1983).  Punitive

damages may be awarded where Defendants' conduct is intentional, willful and/or in reckless

disregard of Plaintiffs' civil rights.  Id. at 37 and 56.  Here, Defendants have directly authorized

their employees' and agents' discriminatory conduct by creating the very discriminatory policies

and practices at issue in this case.  See U.S. v. Space Hunters, Inc., 429 F. 3d 416, 427 (2d Cir.

2005).  Following the filing of this Complaint, Defendants have taken no action to prevent future

housing discrimination by their employees and agents.

     As the facts set forth above demonstrate, MA and Abba acted intentionally, willfully

and/or in reckless disregard of Plaintiffs' civil rights. (See Statement of Facts, supra.)

     In setting an amount of punitive damages to be paid by MA to each Plaintiff, the Court

should take into consideration the fact that a) MA is one of the largest rental brokers in New

York City; b) MA has between 200-250 apartment closings per month, which represents 90% of

the company's business; c) in 2011, MA earned approximately $5 million in broker's fees; d)

MA currently has more than 150 associate brokers, sales persons and employees;  and e) the

present owner of MA founded the company 28 years ago.

     In setting an amount of punitive damages to be paid by Abba to each Plaintiff, the Court

should take into consideration the fact that a) in 2011 Abba had annual gross revenues of

$750,000 to $800,000; b) Abba has expanded its operation in the past two years from one

Brooklyn office to a second office in the Bronx; c) Abba has more than 15 sales persons and

employees; and d) the sole owner of Abba has worked in real estate for nearly twenty years.

     The facts demonstrate that at the time of the complained of discriminatory practices,

neither Defendant had implemented any measures to prevent discrimination by its employees or

agents on the basis of disability or lawful source of income, including adopting non-

discriminatory policies, providing training, or taking any other actions to prevent discrimination

by its employees and agents.  Furthermore, since the filing of this lawsuit when Defendants were

notified of Plaintiffs' allegations, neither Defendant has taken any steps to investigate the

allegations of discrimination and take corrective action.  An award of significant punitive

damages is thus fully justified, and warranted, in this matter.

## VIII.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

Both the FHA and City Human Rights Law authorize this Court to issue injunctive

orders, including those that enjoin the defendants from engaging in discriminatory practices and

that order appropriate action.  42 U.S.C. § 3613(c)(1); N.Y. City Admin. Code § 8-502(a).  See

Southern California Housing Rights Center v. Krug, 564 F. Supp. 2d 1138, 1153-56 (C.D. Cal.

2007); Cabrera v. Jakabovitz, 814 F. Supp. 269, 282-286 (E.D.N.Y. 1993), aff'd in pertinent part,

24 F.3d 372 (2d Cir. 1994); Rogers v. 66-36 Yellowstone Blvd. Co-op Owners, Inc., 599 F.

Supp. 79, 86-87 (E.D.N.Y. 1984).

Defendants' discriminatory practices have reduced the supply of decent and affordable

housing that is available on an equal basis to persons with disabilities who use government rental

subsidies or vouchers, particularly those individuals living with HIV/AIDS and receiving a

HASA housing subsidy.  Defendants have taken no steps since the filing of this lawsuit to stop

their discriminatory practices.  Consequently, Defendants' have frustrated and continue to

frustrate FHJC's ability to accomplish its mission to create open, accessible, and inclusive

communities by imposing discriminatory barriers to access to housing for New Yorkers.  (PFF ¶

51.)  To overcome this continuing frustration of mission, it is necessary and appropriate to

require the implementation of anti-discrimination policies and procedures, fair housing training,

compliance monitoring – including future testing of Defendants, and other measures. (PFF ¶ 52.)

In light of all the factors and circumstances described above, this Court cannot be assured

that Defendants' discriminatory practices have ceased or will cease in the near future without

appropriate injunctive relief for a period of time.  In their accompanying submissions, Plaintiffs

ask this Court to issue an injunction against MA for a longer period of time than against Abba because MA is a larger company with hundreds of agents, and it is reasonable to anticipate that it will take MA longer to implement the terms of the injunction than Abba.  In addition, MA has shown a persistent disregard for the rule of law by ignoring no fewer than four of the Court's prior orders in this case, suggesting a need for greater compliance monitoring.

      For these reasons, Plaintiffs respectfully ask that this Court exercise its equitable powers under the FHA and City HRL to enter an injunction against the Defendants, as more fully set forth in Exhibit 1 to the accompanying Findings of Fact and Conclusions of Law

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs

the relief that they have requested, including compensatory and punitive damages, and injunctive

relief.

Dated:  October 9, 2012
          New York, New York


                              EMERY CELLI BRINCKERHOFF
                              & ABADY LLP


                              By: _____/s/_____
                                     DIANE L. HOUK
                                     75 Rockefeller Plaza, 20th Floor
                                     New York, NY  10019
                                     (212) 763-5000


                              HOUSING WORKS, INC.


                              By: _____/s/_____
                                     ARMEN H. MERJIAN
                                     320 W. 13th Street, 4th Floor
                                     New York, NY  10014
                                     (212) 645-8111, ext. 4167

                              *Attorneys for Plaintiffs*