UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

KEITH SHORT and FAIR HOUSING JUSTICE
CENTER, INC.,

           Plaintiffs,

   -against-                                     11 CV 5989 (KMW)

MANHATTAN APARTMENTS, INC., ABBA          OPINION AND ORDER
REALTY ASSOCIATES, INC., SONI REALTY
LLC, KIMBERLY PLACE REALTY CORP.,
and ASKARINAM REALTY, INC.,

           Defendants.
--------------------------------------------------------------X
WOOD, U.S.D.J.:

       Plaintiffs, Keith Short and the Fair Housing Justice Center, bring this motion for discovery sanctions and attorneys' fees against Defendant Manhattan Apartments based on its failure to produce discovery materials in violation of three court orders.  For the following reasons, the Court GRANTS Plaintiffs' motion and orders Defendant Manhattan Apartments to pay Plaintiffs $23,100.00 in attorneys' fees.

**I.**      <u>**Background**</u>

       Plaintiffs seek compensatory and punitive damages for alleged unlawful discrimination in housing, against those suffering from AIDS (based on disability and source of income).  Plaintiff Keith Short, a 45-year-old disabled man who suffers from AIDS, attempted to rent apartments from various real estate brokers, including Defendant Manhattan Apartments ("MA").[1]  (Compl. ¶¶ 1-2 [Dkt. 1]).  Mr. Short planned to finance his rent with a subsidy from a New York state agency that assists indigent individuals with symptomatic AIDS, the HIV/AIDS Services

---

[1] Although Plaintiffs originally named several other brokers in the Complaint, only two agencies remain at this stage of the litigation, MA and ABBA Realty.  This Opinion only addresses the allegations against MA.

Administration ("HASA").  (*Id.* at ¶¶ 21-23).  MA allegedly refused to show or rent Mr. Short any apartments based on his disability and source of financing, resulting in several months of homelessness and severe emotional distress.  (*Id.* at ¶¶ 28-29; 37-39).

Mr. Short then contacted the Fair Housing Justice Center ("FJHC"), also a Plaintiff, which sent testers—individuals seeking apartments on their own behalf and on behalf of prospective tenants receiving HASA subsidies—to assess MA's rental practices and tape record their interactions.  MA employees allegedly refused to show apartments to FJHC testers using HASA financing, notwithstanding that MA, at the same time, actively tried to rent apartments in the same price range to non-disabled testers.  (*Id.* at ¶¶ 32-36).  MA employees referred to a computer database when discussing landlord preferences with the testers.  For example, when a tester inquired about an apartment for her son, who was financing his rent with a HASA subsidy, the agent "went on her computer and began typing/searching, informing the tester: 'So far, the landlords that we have here are not, um affiliated with the HASA program.'"  (*Id.* at ¶¶ 32).

On January 3, 2012, Plaintiffs served MA with a document request pursuant to a court-approved discovery schedule.  (Merjian Decl. ¶ 2 [Dkt. 64]).  Several months later, when deposing MA employees and MA's proprietor (Jerry Weinstein), Plaintiffs learned that MA had failed to produce numerous documents responsive to their initial request, including screenshots of rental listings from the agency's computer database.  (*Id.*)  According to Plaintiffs, this database contains standard information, such as apartment location and price, as well as information about landlords' preferences.  (*Id.* ¶ 5).  Plaintiffs believe the "landlord requirements" field in the database entries included "directions and directives" from landlords revealing discriminatory practices.  (Hearing Tr. 11:19-11:24, July 2, 2012).  Up to this point, MA had produced only one heavily redacted printout of one listing, which had blacked out the

landlord requirements. (Merjian Decl. ¶¶ 5-6).  Based on Mr. Weinstein's statements, Plaintiffs sought screenshots, including the landlord requirements field, for all listings during the one-year period around Mr. Short's meetings with MA (from July 1, 2010 through June 30, 2011).  (*Id.* ¶ 5).

Plaintiff asked MA to turn over the missing documents by letter on May 10.  (Merjian Decl. Ex. A,  at 4).  MA again failed to produce most of the documents requested, and on June 1, Plaintiff requested court assistance to obtain the relevant materials.  (*Id.* at 3).  In response, this Court issued a discovery order on June 18 specifically directing MA to produce the documents Plaintiffs requested by June 22.  (*Id.*)  MA again failed to meet the deadline, and the Court ordered the parties to appear.  At a July 2 conference, MA explained that it had failed to produce the screenshots because Mr. Weinstein "felt…the dissemination in and of itself would cause harm to the business" and that a confidentiality order was insufficient to protect his interests.  (Hearing Tr. 14:21-14:25, July 2, 2012).  The Court rejected MA's explanation, chastised MA's counsel for failing to bring the issues to the Court's attention prior to the expiration of the discovery order, and encouraged Plaintiffs to bring a motion for fees and costs.  (*Id.* at 15:1-15:25). Finally, the Court ordered MA to produce "all documents requested by plaintiffs" by July 10.  (*Id.* at 15:7-15:12).

On July 9, counsel for MA, David Wims, told Plaintiffs that it could not produce the documents on time, requesting an extension and a confidentiality order.  (Merjian Decl.  ¶ 14).  According to Mr. Wims, MA was in the process of producing hard copies of screenshots of those listings, which was taking longer than expected.  (Merjian Decl. Ex. C, at 2).   MA requested a protective order from the Court, which was denied on July 18.  (Order dated July 18 [Dkt. 59]).

3

On July 17, MA finally produced something in response to Plaintiffs' requests—but not the screenshots MA had promised. Instead, MA produced a spreadsheet created for the purposes of discovery, reflecting some information from the database but lacking significant relevant information, such as the addresses of listed apartments, landlords' names, and any information regarding apartments with a rent over $1,300 per month. (Hearing Tr. 6:6-6:15, Aug. 2, 2012). The spreadsheet did contain some entries under "landlord requirements," including a requirement than an applicant "MUST BE ESTABLISHED WORKING PERSON," "MUST HAVE GREAT JOB," or must be "ESTABLISHED WORKING PEOPLE." (Merjian Decl. ¶ 30; *see also* Merjian Decl. Ex. F). Because the spreadsheet was missing information, however, these entries were not associated with specific properties, addresses, or landlords.

The Court scheduled another conference for August 2. On August 1, Mr. Wims submitted a letter confirming that the spreadsheet was not an original document, but rather had been "created by a data export." (Merjian Decl. Ex. E, at 2; *see also* Hearing Tr. 9:24-9:25, Aug. 2, 2012 ("THE COURT: 'Created by a data export' is about as vague as anyone can be.")). The letter went on to state that "unfortunately Defendant Manhattan is unwilling and/or unable to comply with the Plaintiffs' July 20, 2012 demand for production in its present form." (Merjian Decl. Ex. E, at 2). At the conference, the Court ordered MA—for the third time—to produce the underlying documents Plaintiffs had requested, without redaction, by August 3. (*Id.* at 8:11-9:13; 10:17-10:20). The Court also reiterated its willingness to impose sanctions for MA's deliberate and repeated violation of discovery orders. (Hearing Tr. 10:22-11:12, Aug. 2, 2012).

MA continues to refuse to turn over the documents. (Merjian Decl. ¶ 26). This conduct violates three separate Court orders: one issued in writing on June 18, and two issued to Mr. Wims in person on July 2 and August 2. Mr. Weinstein was fully aware of all three orders,

4

either from Mr. Wims or from the Court directly.  (*See* Hearing Tr. 13:9-13:15, July 2, 2012; Hearing Tr. 12:19-12:22, Aug. 2, 2012).

In light of MA's repeated failure to comply with this Court's discovery orders, Plaintiffs have moved for discovery sanctions against MA, requesting a factual designation that the documents MA failed to produce contain directives from landlords not to assist tenants receiving public housing subsidies.  Plaintiffs have also requested attorneys' fees for their work related to the violation of the discovery orders.[2]  This case is scheduled for a bench trial before Judge Samuel Conti beginning on October 16, 2012.

## II.  Analysis

Plaintiffs seek an order designating certain facts as established and attorneys' fees.  The Court will address each request in turn.

### A.  Designating Facts as Established for Purposes of This Action

Plaintiffs seek sanctions against MA for their repeated failure to turn over discovery materials in violation of three court orders.  Specifically, Plaintiffs request

> an order directing that certain facts be taken as established for the purposes of this action, namely: During the period July 1, 2010 through June 30, 2011, MA's rental listing database included directives to MA from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords.

(Pls.'s Mem. of Law in Support of Pls.'s Mot. for Disc. Sanctions & Att'ys' Fees 9 [Dkt. 65] ("Pls.'s Mem.")).

Federal Rule of Civil Procedure 37(b)(2) provides that, if a party "fails to obey" a discovery order, the court "may issue further just orders," including "[a]n order that…designated

---

[2] Because the misconduct at issue was principally caused by MA, not its counsel, costs and sanctions are to be imposed against MA itself, not Mr. Wims.  (*See* Hearing Tr. 11:5-11:12, Aug. 2, 2012).

5

facts shall be taken as established for the purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A).  Where a party has failed to produce requested evidence, a district court has "broad discretion in fashioning an appropriate sanction."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  Even absent a discovery order, "a court may impose sanctions…under its inherent power to manage its own affairs.  *Id.* at 106-07.

In order to obtain an adverse factual designation against a party who failed to produce evidence, the party seeking the designation must show:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a 'culpable state of mind,'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding Corp.*, 306 F.3d at 107.  Such a remedy "is supported by evidentiary, prophylactic, punitive and remedial rationales"  and "should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent" the wrongful conduct.  *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

MA clearly had an obligation to produce the requested materials under its control. Plaintiffs submitted specific requests to MA, the requested materials were well within the scope of permissible discovery, and the Court issued three orders directing MA to produce them.[3]

MA also had a culpable state of mind in failing to produce the requested documents.  The standard used to establish a culpable state of mind in cases where party has failed to produce or delayed production of documents is the same as it is in destruction of evidence cases.  *See Residential Funding Corp.*, 306 F.3d at 107.  Under this standard, a culpable state of mind is

---

[3] Although MA originally argued that it could not produce the documents because they did not exist, Mr. Wims's subsequent statements indicate that the failure to produce was a result of unwillingness, not inability.  (*See, e.g.*, Merjian Decl. Ex. C, at 2 ("Defendant Manhattan is producing in hard copy the screens from the closed listings database….")).  In any event, MA no longer argues they could not produce the documents in question.

6

established by a showing that "the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'" *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie v. Town of Cromwell*, 243 F. 3d 93, 109 (2d Cir. 2001)). Such failures occur "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Reilly v. Natwest Markets Grp., Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (internal quotations and citations omitted). In *Residential Funding Corp.*, the district judge refused to draw an adverse inference against a party who had delayed production until the eve of trial, based partly on a finding that there was no "bad faith" or "*gross* negligence." *Residential Funding Corp.*, 306 F.3d at 108 (emphasis added).

The Second Circuit reversed and remanded for a new trial, holding that an adverse inference is warranted even in cases of *ordinary* negligence. *Id.* (emphasis added). In clarifying the appropriate standard, the Second Circuit explained that

> [i]t makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.

*Residential Funding Corp.*, 306 F.3d at 108 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991) (Francis, Mag. J.)).

In this case, MA's repeated refusal to turn over relevant documents—in direct violation of three separate Court orders—is enough to establish culpability. Indeed, these repeated violations demonstrate that MA acted with more than simple negligence, it acted with intentional bad faith. *See, e.g.*, *PSG Poker, LLC v. DeRosa-Grund*, 06 Civ. 1104, 2008 WL 190055, at *12 (S.D.N.Y. Jan. 22, 2008) (Cote, J.) ("[Defendant's] repeated failure to either produce relevant documents or a credible story regarding their whereabouts—despite the admonitions of this

7

Court and repeated requests from the plaintiffs—can only be interpreted as an intentional and willful act.").

MA now argues that "it was forced to choose between following the Court's orders or going out of business," because landlords or clients will "take their business elsewhere" if MA were to disclose the relevant documents. (Def. Manhattan Apartment's Mem. of Law in Opp. to Pls.'s Mot. for Disc. Sanctions & Att'ys' Fees [Dkt. 71] ("Def.'s Mem.")). The Court has already ordered MA to produce the documents over this objection, (Hearing Tr. 15:2-15:12, July 2, 2012), and MA repeatedly refused Plaintiffs' offers to enter a confidentiality agreement. (Merjian Decl. ¶ 6). Given these circumstances, MA has offered no credible explanation for its blatant disregard of judicial authority and the discovery process.

Finally, the documents MA failed to produce are relevant to Plaintiffs' case. A party's "bad faith alone is sufficient circumstantial evidence" to support an inference that the evidence was relevant. *Residential Funding Corp.*, 306 F.3d at 109. Even conduct characterized as "purposeful sluggishness," or intentional delay, can support a finding of relevance, as can intentional acts that "hinder discovery." *Id.* at 110. A party may also establish relevance through other evidence of the material's contents, such as deposition testimony. *Id.*; *see, e.g.*, *Byrnie*, 243 F.3d at 109-10 (approving relevance showing where party relied on deposition testimony regarding documents' contents).

Here, MA has clearly acted in bad faith, and this circumstantial evidence alone supports a finding that the evidence was relevant. Beyond that, however, Plaintiffs have presented affirmative evidence that the withheld documents were damaging to MA. First, audio recordings of FJHC testers interacting with MA's agents specifically discuss that landlords do not accept HASA clients. (Pls.'s Mem. 10). Second, in the spreadsheet MA produced purportedly

reflecting information from the database, the "landlord requirements" field includes requirements that applicants must be an "established working person" and "must have great job." (*Id.* at 11). MA has offered no argument to the contrary, instead alleging only that MA failed to produce the requested materials because it would cause landlords to take their business to other agencies. (Def.'s Mem. 3). Given MA's bad faith and the affirmative evidence Plaintiffs have adduced, the Court finds that the documents are relevant.

Although MA requests lesser sanctions, including a stay of the proceedings or punitive damages, these options will not remedy the harm caused by MA's willful disregard for the discovery process. A stay will have little effect in light of MA's flat refusal to turn over the requested materials, flouting repeated requests from Plaintiffs and three Court orders. Punitive damages will not ameliorate the prejudice Plaintiffs have suffered by MA's willful refusal to turn over materials. In order to restore Plaintiffs to the position they would have held absent MA's intentional misconduct and deter future violations in accord with the purposes of Rule 37, the Court uses its wide discretion to craft sanctions and grants Plaintiffs' request to designate facts as established. *See Kronisch*, 150 F.3d at 126 (discussing generally the purposes of Rule 37).

Thus, for the purposes of this action, it must be taken as established that from July 1, 2010 through June 30, 2011, MA's rental listing database included directives from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords.

### B. Attorneys' Fees

Plaintiffs also request attorneys' fees for their time spent dealing with MA's noncompliance. If a party "fails to obey an order to provide or permit discovery," Fed. R. Civ. P.

9

37(b)(2)(A), "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make the award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).  The Court has already decided that sanctions are warranted in this case given MA's failure to comply with discovery orders, and that MA is not substantially justified in its refusal to produce the requested materials.  (*See* Hearing Tr. 15:24-15:25, July 2, 2012; Hearing Tr. 9:5-9:11, Aug. 2, 2012).  The only remaining issue is whether Plaintiffs' requested fees are reasonable.

To calculate a reasonable determination of attorneys' fees, a court should first calculate the "lodestar—the product of a reasonably hourly rate and the reasonable number of hours required by the case," which the Second Circuit calls the "presumptively reasonable fee." *Millea v. Metro-N. R.R. Co.*, 684 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2007)).  This calculation "boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Konits v. Karahalis*, 409 F. App'x 418, 422 (2d Cir. 2011) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)).  A court may reduce requested fees if the attorneys' documentation of their hours is vague, or if their requests reflect work that could or should have been completed by a paralegal or secretary.  *See Truong v. N.Y. Hotel & Motel Trades Council*, 07 Civ. 11383, 2011 WL 147689, at *2 (S.D.N.Y. Jan. 12, 2011) (Holwell, J.).

    1. Reasonable Hourly Rate

A reasonable hourly rate is "the rate a paying client would be willing to pay," *Arbor Hill*, 552 F.3d at 190, given that a party wishes to spend the "minimum necessary to litigate the case

effectively." *Konits*, 409 F. App'x at 422. This rate should be set by assessing "case-specific considerations at the outset," *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 420 (2d Cir. 2010), including the skill of the lawyers, the complexity of the issues, the timing demands of the case, and the availability and expertise of alternative counsel. *See Arbor Hill*, 522 F.3d at 190. The court's ultimate determination of a reasonable rate should be based on an objective assessment of the "prevailing market rates in the relevant community." *Truong*, 2011 WL 147689, at *2; *see also Perdue*, 130 S. Ct. at 1672 (approving objective measure of attorneys' rates).

Plaintiffs are represented by two attorneys: Diane L. Houk, Of Counsel with Emery Celli Brinckerhoff & Abady LLP ("ECBA"), and Armen H. Merjian, the Senior Staff Attorney at Housing Works, Inc., an organization providing social services to New Yorkers living with HIV and AIDS. (Houk Decl. ¶ 1; Merjian Decl. ¶ 1). Plaintiffs request an hourly rate of $525 per hour for Houk, and $500 per hour for Merjian.

Ms. Houk graduated from the Columbia School of Law in 1983, and has over twenty-five years of experience in the practice of fair housing law, including thirteen years in the Civil Rights Division of the United States Department of Justice and five years as the co-founder and executive director of FJHC. (Houk Decl. ¶ 2). She has obtained numerous favorable decisions on housing rights since joining ECBA in 2009, (*id.* at ¶ 5), and has experience drafting and examining housing discrimination policy. (*Id.* at ¶ 6).

Mr. Merjian graduated from the Columbia School of Law in 1990, and has been a staff attorney at Housing Works for fifteen years. (Merj. Decl. ¶ 36). Prior to joining Housing Works, he spent six years as an associate at Winthrop, Stimson, Putnam & Roberts, participating in complex litigation as well as civil rights cases. (*Id.* at ¶ 34). At Housing Works, Mr. Merjian

11

has developed a strong record on civil rights cases for individuals with HIV and AIDS, (*id.* at ¶ 36), and has published thirteen law review articles on civil rights law. (*Id.* at ¶ 37).

"[C]onsistent precedent in the Southern District reveals that rates awarded to experienced civil rights attorneys over the past ten years have ranged from $250 to $600…with average awards increasing over time." *DeCurtis v. Upward Bound Intern., Inc.*, 09 Civ. 5378, 2011 WL 4549412, at *7 (S.D.N.Y. Sept. 27, 2011) (Sullivan, J.) (quoting *Lanzetta v. Florio's Enters., Inc.*, No. 08 Civ. 6181, 2011 WL 3209521, at *7 (S.D.N.Y. July 27, 2011)); *see also Torres v. Gristedes Operating Corp.*, No. 04 Civ. 3316, 2012 WL 3878144, at *3 (S.D.N.Y. Aug. 6, 2012) (Crotty, J.) (collecting similar cases and reducing attorney's request from $650 to $550 per hour); *Scott v. City of New York*, 643 F.3d 56, 59-60 (2d Cir. 2011) (approving Southern District judge's determination that $550 per hour in a FLSA case was reasonable). Plaintiffs seek rates within this range, of $525 per hour for Ms. Houk and $500 per hour for Mr. Merjian.

The Court finds these rates to be reasonable in light of its own experience regarding rates in the Southern District and the factors identified in *Arbor Hill*. Although Plaintiffs request rates at the upper end of the prevailing range, such rates are justified because both Ms. Houk and Mr. Merjian have more than twenty years of experience, and extensive track records of positive results in the specialized field of housing discrimination. Further, because the subject matter of this case is novel—it is the first to allege housing discrimination against individuals with AIDS—a client would be willing to pay a premium for experienced counsel with an intimate understanding of the particular issues at stake.

MA offers two arguments against Plaintiffs' proposed rates. First, MA argues that the requested rates are unreasonable because the motions at issue here were relatively straightforward, or "interlocutory and related to discovery." (Def's Mem. 6). The complexity of

the case does not influence whether or not a rate is reasonable, however, but rather should be reflected in "the number of billable hours recorded by counsel." *Millea*, 658 F.3d at 167 (quoting *Perdue*, 130 S. Ct. at 1673). Second, MA requests that this Court "reject the lodestar method" and "employ another method which results in a more reasonable calculation." (Def.'s Mem. 7). MA has not offered any justification for departing from the Second Circuit's method of fee calculation, and the Court declines to do so in this case. Thus, the Court applies a rate of $525 per hour for Ms. Houk and $500 per hour for Mr. Merjian.

      2. <u>Hours Reasonably Expended</u>

In assessing whether hours were reasonably expended, the relevant issue "is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). In so determining, courts should look at the amount of time spent on each task, and then decide how much of that time was reasonably expended given "the scope and complexity of the particular litigation." *N.Y. Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983). Whether or not the time was reasonable should be based on the court's familiarity with the case, as well as the parties' arguments and evidentiary submissions. *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992).

Parties in breach of a discovery order must pay the "reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(b)(2)(C). Ms. Houk has billed 19 total hours, and Mr. Merjian 25.5 of work and 1.5 hours of travel, billed at one-half his hourly rate. Each attorney has submitted a detailed, contemporaneous record of the tasks these hours encompass. (*See* Houk Decl. Ex. C; Merjian Decl. Ex. H). These records confine their request for compensation to work caused by MA's failure, including consultation between Ms. Houk and

Mr. Merjian regarding production, strategy, and other issues; reviewing the incomplete documents MA did produce; reviewing correspondence from and drafting correspondence to MA regarding their ongoing recalcitrance; drafting correspondence to the Court regarding MA; preparing for and attending the conferences on July 2 and August 2; and researching, drafting and editing the motion for sanctions and accompanying declarations. (*Id.*)

Defendant MA asserts three main challenges to Plaintiffs' submissions. First, MA argues that Mr. Merjian's request for .75 hours of travel to and from the courthouse to attend conferences on July 2 and August 2 is excessive. (Def.'s Mem. 5). Mr. Merjian has listed his travel time separately and attests that he used that time to prepare for court and perform other case-related tasks, (Merjian Decl. ¶ 43), and has requested only 50% of his usual rate for travel, in accord with Southern District practice. *See Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 459 (S.D.N.Y. 2011) (Sullivan, J.). Under these circumstances, the Court rejects MA's argument and finds Mr. Merjian's request reasonable.

Second, MA asserts a smaller award is warranted because certain specific entries are excessive, Ms. Houk and Mr. Merjian's hours are duplicative, and the case is not complex. (Def.'s Mem. 5-6). After examining the time entries, the Court disagrees and finds Plaintiffs' requests reasonable. Plaintiffs' submissions have been of exceptionally high quality throughout the course of this discovery dispute. Further, Plaintiffs' hours are relatively conservative given the volume of briefs, letters, and motions submitted, and have omitted time spent on the case by other attorneys. (Merjian Decl. ¶ 44). Having co-counsel attend conferences and confer with one another regarding strategy is essential, not duplicative, where, as here, attorneys represent multiple parties and face novel questions.

Finally, MA challenges the time entries for certain calls, noting that Ms. Houk and Mr. Merjian list different lengths for various telephone calls. (Def.'s Mem. 6). The Court has examined Plaintiffs' records, and finds the requests reasonable. Where the attorneys indicate different times for telephone calls, the time entries include other tasks, such as preparation and follow up, that explain any minor discrepancies.

Accordingly, the Court finds that Plaintiffs requests are reasonable. After multiplying the reasonable rate by the hours reasonably expended, the Courts awards Plaintiffs $23,100.00 in attorneys' fees, to be paid by Defendant Manhattan Apartments.

## III. Conclusion

For the reasons stated above, Plaintiffs' Motion for Discovery Sanctions and Attorneys' Fees is GRANTED and Defendant Manhattan Apartments is ordered to pay Plaintiffs $23,100.00 in attorneys' fees.

SO ORDERED.

Dated: New York, New York
October 10, 2011

*[signature]*
Kimba M. Wood
United States District Judge